HBA CONTRACTORS, INC., demandante y peticionaria, *v.* MUNICIPIO DE CEIBA, demandado y recurrido.

*Número:* CC-2003-639 *Resuelto:* 6 de diciembre de 2005

444

*Rafael M. Santiago Rosa* y *Josué A. Rodríguez Robles*, aboga-dos de la parte peticionaria; *Ángel S. Ruiz Rodríguez, Al-*

*berto Rodríguez Ramos* y *Cristina S. Belaval Burger*, abogados de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

Los hechos del presente caso —sobre los cuales no existe controversia— revelan que entre 1997 a 1999 el Departamento de Defensa de Estados Unidos contrató a HBA Contractors, Inc. (HBA)[1] para que realizara dos proyectos de construcción en terrenos federales localizados en la Base Naval Roosevelt Roads, en el Municipio de Ceiba (Municipio). Ambos proyectos consistían en remodelar o renovar unas estructuras existentes dentro de la referida base. El primer proyecto consistía en la reparación y remodelación de una estructura utilizada como hangar[2] y el segundo proyecto en la renovación y alteración interior de un edificio de residencia de oficiales solteros.[3]

En vista de este contrato, el 1 de mayo de 2000 el Municipio le envió una carta a HBA notificándole que adeudaba la cantidad de $216,858.80 por arbitrios de construcción.[4] A solicitud de HBA, el 10 de julio de 2000, ésta y el director de finanzas del Municipio, Andrés Ruiz Rodríguez, se reunieron para aclarar la existencia de la alegada deuda de arbitrios de construcción.

---

[1] HBA Contractors, Inc. (HBA) es una corporación organizada y que hace negocios de acuerdo con las leyes del Estado Libre Asociado de Puerto Rico. La referida entidad se dedica desde su incorporación al negocio de la construcción.

[2] El contrato de este primer proyecto se firmó el 30 de septiembre de 1997. Este proyecto se llevaría a cabo por la cantidad de $2,263,000. Posteriormente, el 27 de septiembre de 1999, en virtud de una enmienda al contrato original, el costo total del proyecto aumentó a $2,514,470.

[3] Este contrato se firmó el 20 de septiembre de 1999. Este segundo proyecto se llevaría a cabo por la cantidad de $2,907,000. Posteriormente, el 11 de julio de 2000, el costo original del proyecto fue revisado y aumentado a $2,938,484.

[4] El referido arbitrio fue calculado conforme a las disposiciones de la Ordenanza Municipal Núm. 8, Serie 1991-1992, aprobada el 15 de octubre de 1991, y la Ordenanza Municipal Núm. 33, Serie 1997-1998, aprobada el 27 de mayo de 1998, del Municipio de Ceiba (Municipio), la cual derogó y sustituyó a la antes mencionada ordenanza. Éstas autorizaron al Municipio a imponer y cobrar un arbitrio de construcción por proyectos —como los que tenía que realizar HBA— dentro de los límites territoriales del Municipio.

Al día siguiente, HBA le envió una carta al Municipio en la cual resumió lo acontecido en dicha reunión y recalcó sus planteamientos sobre los errores en el cómputo de los arbitrios de construcción.(5) Así las cosas, el 25 de agosto de 2000, el Municipio le envió una segunda carta a HBA en la cual le notificó una *determinación final* de arbitrios de construcción, ascendentes a $179,141.75, cantidad que no incluía los intereses, recargos y penalidades.(6)

El 14 de septiembre de 2000 HBA presentó ante el Tribunal de Primera Instancia, Sala Superior de Fajardo, una demanda contra el Municipio, en la cual solicitó la revocación de la determinación final del Municipio respecto a la imposición del arbitrio de construcción. Alegó, en síntesis, que la actuación del Municipio al imponer el arbitrio sobre los proyectos realizados por HBA en la mencionada Base Naval *constituía una actuación* ultra vires *del Municipio, debido a que éste carecía de jurisdicción para ello.* En la alternativa, solicitó que se ordenara al Municipio utilizar una tasa de interés distinta para hacer el cómputo del arbitrio, ya que, según alegó, éste había utilizado tasas incorrectas y no sustentadas por las ordenanzas municipales aplicables a cada uno de los proyectos.

Luego de varios trámites procesales, y antes de que el

---

(5) A esos efectos, HBA hizo constar, entre otras cosas, que consideraba que había un error de cómputo en el cálculo de los arbitrios de construcción, ya que se había aplicado la ordenanza municipal incorrecta y se habían utilizado tasas incorrectas en el cálculo del arbitrio. Indicó que se había utilizado equivocadamente la taza de la Ordenanza Núm. 33, ante, que fue firmada el 27 de mayo de 1998, fecha posterior al comienzo del proyecto del hangar. En virtud de lo anterior, señaló que era la Ordenanza Núm. 8, ante, la que debía ser utilizada para computar los arbitrios del primer proyecto.

(6) Determinó el Municipio que efectivamente la Ordenanza Municipal que aplicaba al proyecto del hangar era la Núm. 8 y a todos los trabajos realizados por la compañía antes del 27 de mayo de 1998. No obstante, determinó que la referida ordenanza no aplicada al segundo proyecto. Del mismo modo, informó que no aplicaba el inciso B-2 de la Sec. 4ta de la Ordenanza Municipal Núm. 8 ni de la Sec. 3ra de la Ordenanza Municipal Núm. 33, respectivamente, ya que estas disposiciones aplicaban únicamente a reparaciones, ampliaciones, demoliciones, alteraciones y mejoras a un costo de $10,000 o más, en unidades unifamiliares, cuya construcción no fuera parte de un proyecto de vivienda, urbanización, condominio u otros proyectos de similar naturaleza, cuyo costo total sea de $50,000 o menos.

Municipio presentara su contestación a la demanda, HBA presentó una moción para que se dictara sentencia sumaria a su favor. En ésta nuevamente alegó que el Municipio carecía de jurisdicción, y de facultad en ley, para imponer arbitrios de construcción sobre obras realizadas en los predios de la Base Naval Roosevelt Roads.

El Municipio se opuso a la referida moción y solicitó, a su vez, que se dictara sentencia sumaria a su favor. Alegó, en síntesis, que al amparo de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, Ley Núm. 81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. sec. 4001 *et seq.* (Ley de Municipios Autónomos), el Municipio tenía jurisdicción para imponer y cobrar el referido arbitrio. Alegó, además, que mediante la Ley Buck, 4 U.S.C.A. sec. 105 *et seq.*, el Gobierno federal había autorizado, por excepción, la imposición del arbitrio de construcción a obras o proyectos de construcción sitos en lugares como la Base Naval Roosevelt Roads.

Así las cosas, y al no existir controversia alguna sobre los hechos en el caso, el 11 de octubre de 2002 el foro primario emitió sentencia sumaria declarando *"con* lugar" la demanda y revocando la determinación final de arbitrios de construcción del Municipio. A esos efectos, resolvió que aunque el Municipio tenía facultad para imponer el referido arbitrio sobre obras de construcción llevadas a cabo dentro de sus límites territoriales, esa autoridad no se extendía a obras realizadas dentro de la Base Naval Roosevelt Roads. Al fundamentar su determinación, expresó que mediante la Ley Buck el Congreso de Estados Unidos había autorizado la imposición de arbitrios dentro de enclaves federales únicamente cuando fueran "contribuciones sobre ingresos". Interpretando la Ley de Municipios Autónomos y la casuística de Puerto Rico,[7] el foro de instancia

---

[7] Específicamente, citó decisiones de este Tribunal relacionada con la distinción que hemos establecido entre los conceptos *contribución sobre ingresos* y *derecho (fee)*. De este modo, mencionó lo resuelto en *Municipio de Carolina v. Caribair*, 101

resolvió que el arbitrio de construcción era un *"derecho"* que se imponía por el evento de llevar a cabo la actividad comercial, calculado a base del costo total de la obra, y no una *"contribución sobre ingresos"*. En virtud de lo antes expresado, concluyó que el referido arbitrio no estaba autorizado por la Ley Buck.(8)

Inconforme con esta determinación, el 10 de diciembre de 2002, el Municipio acudió —vía recurso de apelación— ante el Tribunal de Apelaciones. Alegó, en síntesis, que el foro primario había interpretado incorrectamente la definición del concepto *"contribución sobre ingresos"* que establece la Ley Buck. A tales efectos, adujo que el tribunal basó su determinación en jurisprudencia local, inaplicable al caso, cuando éste involucraba una cuestión de interpretación federal. Arguyó que para que la contribución estuviese cobijada por el referido estatuto federal, lo necesario era establecer que la contribución se basaba o se medía con respecto al ingreso del ciudadano. De este modo, argumentó que el arbitrio aquí en cuestión estaba cobijado por la Ley Buck, ya que éste es establecido a base del costo total de la obra declarada por el contratista, es decir, con respecto al ingreso total de la obra del contratista. En virtud de lo anterior, sostuvo que procedía la imposición de los arbitrios de construcción en cuanto a las obras realizadas por HBA en la Base Naval Roosevelt Roads.

Tras varios trámites procesales, y luego de celebrar una vista oral, el foro apelativo intermedio dictó una sentencia *revocatoria* de la emitida por el Tribunal de Primera Instancia, en la cual resolvió que el foro primario había inci-

---

D.P.R. 943 (1974), *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772 (1968), *P.R. Telephone Co. v. Tribl. Contribuciones*, 68 D.P.R. 154 (1948), y *Meléndez v. Registrador*, 63 D.P.R. 1023 (1944).

(8) Precisa señalar que en la *última nota al calce* de la sentencia del foro primario se señaló que el arbitrio de construcción no era válido no sólo porque no existía ley o legislación federal que lo permitiera sino, además, porque no se justificaba su imposición debido a que HBA no recibiría *quid pro quo* alguno a cambio de sus bienes. Es decir, que HBA no recibiría servicio alguno a cambio del pago del referido arbitrio.

dido al determinar que el Municipio no tenía facultad para imponer los arbitrios de construcción sobre los proyectos de HBA en los terrenos federales de la Base Naval Roosevelt Roads.

No obstante reiterar lo expresado por el tribunal de instancia, a los efectos de que mediante la Ley Buck el Gobierno federal sólo autorizó la imposición de arbitrios dentro de enclaves federales cuando fueran *"contribuciones sobre ingresos"*, el foro apelativo intermedio señaló que *el concepto "contribución sobre ingresos", según definido por la Ley Buck, lo que requiere es que el arbitrio se imponga respecto al ingreso neto, ingreso bruto o entrada bruta del ciudadano.* En virtud de lo anterior, concluyó que era válida la imposición del arbitrio aquí en cuestión, ya que se calculaba a base de las entradas brutas que el contratista recibía por llevar a cabo su actividad de construcción. En consecuencia, ordenó la devolución del caso al foro primario para la continuación de los procedimientos, específicamente con relación a la determinación de la cuantía del arbitrio de construcción.

Insatisfecha con este dictamen, HBA acudió —vía *certiorari*— ante este Tribunal, señalando que incidió el Tribunal de Apelaciones al

> ... revocar la sentencia emitida por el Honorable Tribunal de Instancia, bajo el fundamento de que el arbitrio de construcción dispuesto en la Ley de Municipios Autónomos constituye una "contribución sobre ingresos" según se define dicho término en la Ley Buck, 4 U.S.C.A. § 105 *et seq.*
> ... no confirmar la determinación que hizo el Honorable Tribunal de Primera Instancia en cuanto a que es inválida la imposición del arbitrio de construcción a HBA Contractors, Inc. En atención a la inexistencia de *quid pro quo;* es decir, el contribuyente no obtiene beneficio alguno a cambio del pago de dicho tributo. Petición de *certiorari*, págs. 3–4.

*Expedimos el recurso.* Contando con la comparecencia de ambas partes, y estando en condiciones de resolver, procedemos a hacerlo.

# I

Por estar íntimamente relacionados entre sí, analizamos y discutimos ambos señalamientos de error en conjunto.

■ De entrada precisa destacar que, conforme a "nuestro ordenamiento constitucional la facultad para imponer contribuciones compete primordialmente a la Rama Legislativa". *Café Rico, Inc. v. Mun. de Mayagüez*, 155 D.P.R. 548, 552 (2001). Véase, además, *F.D.I.C. v. Mun. de San Juan*, 134 D.P.R. 385, 390 (1993). A esos efectos, la Constitución del Estado Libre Asociado de Puerto Rico dispone que "[e]l poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido". Art. VI, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 401. Véase, además, *Levy, Hijo v. Mun. de Manatí*, 151 D.P.R. 292, 299 (2000). De igual forma, nuestra Constitución le confiere a la Legislatura la "facultad para crear, suprimir, consolidar y reorganizar municipios, modificar sus límites territoriales y determinar lo relativo a su régimen y función". Art. VI, Sec. 1, Const. E.L.A., ante, pág. 400. Véanse, además: *Café Rico, Inc. v. Mun. de Mayagüez*, ante; *F.D.I.C. v. Mun. de San Juan*, ante, pág. 391; *American Express Co. v. Mun. de San Juan*, 120 D.P.R. 339, 344-345 (1988).

■ Conforme a los antes mencionados mandatos constitucionales, este Tribunal ha señalado que "los municipios no tienen un poder inherente, independiente del Estado, para imponer contribuciones". *Levy, Hijo v. Mun. de Manatí*, ante, pág. 299. Véanse, además: *Café Rico, Inc. v. Mun. de Mayagüez*, ante; *Las Piedras Const. Corp. v. Mun. de Dorado*, 134 D.P.R. 1018, 1021–1022 (1994); *American Express Co. v. Mun. de San Juan*, ante, pág. 345. No obstante lo anterior, hemos reiterado que "mediante mandato

claro y expreso la legislatura puede delegarles esta facultad". *Café Rico, Inc. v. Mun. de Mayagüez*, ante, pág. 553. Véanse, además: *F.D.I.C. v. Mun. de San Juan*, ante, pág. 391; *Las Piedras Const. Corp. v. Mun. de Dorado*, ante, págs. 1021–1022.

Ahora bien, hemos señalado que el antes mencionado poder impositivo municipal puede ser ejercido sólo "sobre materias no incompatibles con la tributación impuesta por el Estado". *Café Rico, Inc. v. Mun. de Mayagüez*, ante. Véanse, además: *Levy, Hijo v. Mun. de Manatí*, ante, pág. 300; *F.D.I.C. v. Mun. de San Juan*, ante, pág. 391.

En virtud de lo anterior, "la Asamblea Legislativa ha aprobado varias leyes que regulan la facultad municipal para recaudar impuestos". *Levy, Hijo v. Mun. de Manatí*, ante, pág. 299. Entre ellas encontramos la Ley de Municipios Autónomos,[9] a través de la cual la Legislatura autorizó a los municipios a imponer y cobrar varias contribuciones, derechos, arbitrios e impuestos razonables dentro de sus límites territoriales. Art. 2.002 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4052(d); *Levy, Hijo v. Mun. de Manatí*, ante, pág. 300.

A través de los años la Asamblea Legislativa ha *ampliado* las facultades contributivas de los municipios. De particular relevancia al caso ante nos es la Ley Núm. 199 de 6 de septiembre de 1996 (Ley Núm. 199). Mediante la referida pieza legislativa la Legislatura autorizó, *expresamente*, a los municipios a cobrar *arbitrios sobre actividades de construcción*, realizadas dentro de sus límites territoriales. Exposición de Motivos de la Ley Núm. 199 (1996 Leyes de Puerto Rico 1116).

El antes mencionado estatuto tuvo la intención de acla-

---

[9] La Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (21 L.P.R.A. sec. 4001 *et seq.*) derogó la Ley Núm. 146 de 18 de junio de 1980, según enmendada, mejor conocida como la Ley Orgánica de los Municipios de Puerto Rico.

rar grandes lagunas legislativas existentes en torno a la referida autoridad. De este modo, la Asamblea Legislativa se dio a la tarea de definir con mayor claridad el alcance y las limitaciones de la facultad otorgada a los municipios para imponer los referidos arbitrios. Exposición de Motivos de la Ley Núm. 199, ante. Véase, además, *Río Const. Corp. v. Mun. de Carolina*, 153 D.P.R. 615 (2001).

La referida pieza legislativa estableció, entre otras cosas, los procedimientos para la determinación de este arbitrio, su imposición, exenciones, reclamaciones, reembolsos y las sanciones administrativas y penales. Para lograr los propósitos de la medida se establecieron tres términos fundamentales, a saber: *arbitrio de construcción*,[10] *contribuyente*[11] y *actividad de construcción*.

Particularmente, al definir el concepto *actividad de construcción*, la Legislatura precisó el tipo de actos o actividades que serían objeto del arbitrio de construcción. Art. 1.003 de la Ley Núm. 81, ante, 21 L.P.R.A. sec. 4001(dd). Específicamente, se dispuso que se *excluía* del

---

[10] Este término estableció el tipo de actividad de construcción sobre la cual recaería la contribución que impondrá el municipio, establecido mediante una ordenanza, dentro de sus límites territoriales. Art. 1.003 de la Ley Núm. 81, ante, según enmendada, 21 L.P.R.A. sec. 4001(cc); Informe de la Comisión de Asuntos Municipales y de la Comisión de Hacienda de la Cámara de Representantes con respecto al proyecto P. de la C. 1938, 8 de mayo de 1996, págs. 21–22. A su vez, el referido concepto clarificó que la imposición de un arbitrio de construcción constituiría un acto separado y distinto que no privaba o limitaba la facultad de los municipios o del Estado de imponer otras contribuciones, arbitrios, impuestos, licencias, derechos, tasas y tarifas, y que la facultad de los municipios y el Estado de imponer contribuciones sobre el mismo objeto, como lo es la actividad de construcción, no representa una doble tributación. Informe, ante. La referida aclaración se incluyó en virtud de dos decisiones de este Tribunal, a saber: *Las Piedras Const. Corp. v. Mun. de Dorado*, 134 D.P.R. 1018 (1994), y *Nogama Const. Corp. v. Mun. de Aibonito*, 136 D.P.R. 146 (1994), donde determinamos que unos impuestos municipales eran ilegales, ya que su imposición constituía una doble tributación no permitida clara y explícitamente por ley.

[11] Al definir el concepto *contribuyente* se delimitaron claramente las respectivas responsabilidades de dos personas naturales o jurídicas distintas con respecto al pago del arbitrio de construcción. A saber, se estableció la responsabilidad del dueño que ejecuta directamente las labores de administración o de ejecución de la obra de construcción, o ambas, y la de persona que es contratada para llevar a cabo la obra. Art. 1.003 de la Ley Núm. 81, ante, 21 L.P.R.A. sec. 4001(ee); Informe, ante, pág. 22.

pago del arbitrio de construcción todo acto o actividad que no requiriera un permiso de construcción expedido por la Administración de Reglamentos y Permisos. Íd. Véase, además, *Río Const. Corp. v. Mun. de Carolina*, ante.

■ Aun cuando la referida disposición no hacía mención alguna de que dicha exención se extendía a las entidades privadas que hacían negocios de construcción u otros similares con organismos gubernamentales, surgieron problemas debido a que se podía interpretar que ésta podría incluir obras de carácter público realizadas por entidades privadas contratadas o subcontratadas para esos fines. En virtud de lo anterior, en 1998 la Asamblea Legislativa aprobó dos enmiendas a la Ley de Municipios Autónomos para aclarar la intención legislativa consignada mediante la aprobación de la Ley Núm. 199 de 6 de septiembre de 1996, la cual consistía en imponer arbitrios de construcción a toda actividad u obra de construcción realizada dentro de los límites de un municipio por una persona natural o jurídica privada. Exposición de Motivos de la Ley Núm. 130 de 17 de julio de 1998, (Parte 1) Leyes de Puerto Rico 538; Exposición de Motivos de la Ley Núm. 323 de 24 de diciembre de 1998, (Parte 2) Leyes de Puerto Rico 476. Véase, además, *Río Const. Corp. v. Mun. de Carolina*, ante.

La primera de dichas enmiendas fue la Ley Núm. 130, ante (Ley Núm. 130). Específicamente, el referido estatuto fue aprobado con la intención de reafirmar la facultad cedida por ley a los municipios para sufragar los servicios que otorgan a sus ciudadanos y para asegurar que todo contratista que realice una obra pública del Gobierno central, municipal o federal, pague el arbitrio de construcción correspondiente en el municipio en donde se lleva a cabo dicha obra, previo al comienzo de ésta. Exposición de Motivos de la Ley Núm. 130, ante.[12]

---

[12] A esos efectos, se enmendó el inciso (d) del Art. 2.002 de la Ley de Municipios Autónomos, donde se dispone la facultad de los municipios para imponer contribuciones, tasas, tarifas, entre otras. Específicamente se dispuso, en lo aquí pertinente, lo siguiente:

En segundo término, la Legislatura aprobó la Ley Núm. 323, ante (Ley Núm. 323).[13] Ésta estableció la aplicación retroactiva sobre cualquier determinación e imposición de arbitrio de construcción emitida bajo las disposiciones de la Ley Núm. 199, ante.

 Cónsono con lo anterior y en conformidad con la anterior autorización, en este caso el Municipio aprobó[14] la Ordenanza Municipal Núm. 8, Serie 1991-1992, de 15 de octubre de 1991. Posteriormente, y para derogar y sustituir la antes mencionada ordenanza aprobó la Ordenanza Municipal Núm. 33, Serie 1997-1998, de 27 de mayo de 1998. Mediante estas ordenanzas el referido Municipio reglamentó lo concerniente a la imposición y al cobro de arbitrios de construcciones, reconstrucciones, relocalizaciones, mejoras, instalaciones, obras de infraestructura y cualquier otra obra, dentro de los límites territoriales del municipio.

Al amparo de ambas ordenanzas, el Municipio, prima facie, tenía facultad para imponer el arbitrio de construcción por las obras realizadas por HBA dentro de sus límites territoriales, no obstante la referida entidad haber sido

---

"Toda obra de construcción dentro de los límites territoriales de un municipio, realizada por una persona natural o jurídica privada, o que sea llevada a cabo por una persona natural o jurídica privada a favor o en representación de, o por contrato o subcontrato suscrito con una agencia o instrumentalidad del Gobierno Central o Municipal o del Gobierno Federal, incluyendo aquella obra que no requiera la solicitud o expedición de un permiso por la Administración de Reglamentos y Permisos o por un municipio autónomo, deberá pagar arbitrio de construcción correspondiente, previo al comienzo de dicha obra." 21 L.P.R.A. sec. 4052(d).

[13] A esos fines, se enmendó la definición de *actividad de construcción*. Se estableció, en lo aquí pertinente, lo siguiente:

"Se exime del pago de arbitrio de construcción las obras que realice por administración una agencia del gobierno central o sus instrumentalidades, una corporación pública, un municipio o una agencia del gobierno federal. No obstante, esta exención no aplica ... cuando se trate de obras de construcción llevadas a cabo por una persona natural o jurídica privada actuando a favor o en representación de o por contrato o subcontrato suscrito con una agencia del gobierno federal, cuando las leyes o reglamentos federales aplicables así lo permitan." 21 L.P.R.A. sec. 4057(f)(5).

[14] Conforme a la Ley de Municipios Autónomos, según enmendada, todo arbitrio de construcción tiene que ser "impuest[o] por los municipios a través de una ordenanza municipal aprobada con dos terceras (2/3) partes para ese fin ...". 21 L.P.R.A. sec. 4001(cc).

458

contratada por el Departamento de Defensa de Estados Unidos. *Ahora bien*, debemos determinar si dicha facultad impositiva aplicaba a construcciones realizadas dentro de terrenos federales de la Base Naval Roosevelt Roads, ya que en los referidos terrenos existía jurisdicción exclusiva federal.

## II

La Asamblea Legislativa de Puerto Rico, mediante la aprobación de la Ley de 16 de febrero de 1903, en sus Secs. 5 y 6, mejor conocida como la Ley Autorizando al Gobernador de Puerto Rico para Traspasar Ciertos Terrenos a los Estados Unidos para Fines Navales o Militares y para Otros Fines Públicos, dio su consentimiento a Estados Unidos para adquirir terrenos en nuestra isla para fines navales y militares y para otros fines públicos, y se dispuso que al así hacerlo cesaría la jurisdicción de Puerto Rico sobre éstos.([15]) *Roberts v. U.S.O. Council of Puerto Rico*, 145 D.P.R. 58, 65 (1998).

Este Tribunal ha tomado conocimiento judi-

---

([15]) El texto original de las disposiciones pertinentes de la Ley de 16 de febrero de 1903 establecían, en lo pertinente, lo siguiente:

"Sección 5.—Que se dé y por la presente se d[a], el consentimiento [a] los Estados Unidos para adquirir, para fines navales [o] militares [u] otros fines públicos, por compra [o] expropiación forzosa, cualesquiera terrenos en la Isla de Puerto Rico, y cuando fuesen adquiridos en esta forma, y los Estados Unidos hayan tomado posesión de los mismos, toda jurisdicción sobre tales terrenos por parte de 'El Pueblo de Puerto Rico' cesará y terminará ipso facto. Disponiéndose no obstante que, si subsecuentemente los Estados Unidos enajenaren cualquiera [o] todas las tierras adquiridas en esta forma, El Pueblo de Puerto Rico volverá a tener jurisdicción sobre las mismas.

"Sección 6.—Que la jurisdicción exclusiva sea y es por la presente cedida [a] los Estados Unidos sobre cualquiera y todas las tierras que puedan en adelante adquirir en la Isla de Puerto Rico por compra [o] expropiación forzosa ...." 1903 Leyes de Puerto Rico 114.

En 1955, a través de la aprobación de la Ley Núm. 63 de 10 de junio de 1955 (28 L.P.R.A. sec. 46), la antes mencionada Sec. 5 de la Ley de 16 de febrero de 1903 fue derogada, y la Sec. 6 fue enmendada. No obstante lo anterior, éstas aplican al presente caso, ya que los terrenos donde está localizada la Base Naval Roosevelt Roads fueron cedidos a Estados Unidos antes de 1955. *Roberts v. U.S.O. Council of Puerto Rico*, 145 D.P.R. 58, 64–65 (1998).

cial del hecho de que la Base Naval Roosevelt Roads, lugar donde se llevaron a cabo las obras de construcción objeto del presente caso, fueron adquiridas por el Gobierno federal antes de 1955. *Roberts v. U.S.O. Council of Puerto Rico*, ante, pág. 65; *Capitol Construction v. Srio. de Hacienda*, 89 D.P.R. 326, 329–330 (1963). Hemos señalado que la jurisdicción de Puerto Rico cesó desde entonces y corresponde exclusivamente a Estados Unidos.([16]) Íd. En virtud de lo anterior, para que proceda una imposición contributiva local dentro de los terrenos de jurisdicción federal exclusiva de la Base Naval Roosevelt Roads, *el Congreso de Estados Unidos tiene que haberlo autorizado expresamente mediante estatuto.* Véase *Capitol Construction v. Srio. de Hacienda*, ante, pág. 332.([17])

 Mediante la Ley Buck, el Congreso de Estados Unidos le concedió el poder a los estados, posesiones o territorios, *incluyendo a Puerto Rico,*([18]) para legislar sobre el cobro de *"contribuciones sobre ingresos"* por las activida-

---

([16]) Mediante la Ley Núm. 62 de 10 de junio de 1955 (28 L.P.R.A. sec. 54 *et seq.*) se alteró el esquema anterior, puesto que en lugar de concederse jurisdicción exclusiva automáticamente a Estados Unidos, como ocurría en virtud de la Ley de 16 de febrero de 1903 una vez éstos la solicitaran, mediante la nueva ley el Estado Libre Asociado de Puerto Rico mantiene jurisdicción sobre dichos terrenos, salvo que ésta sea cedida en la forma prevista por el Art. 2 de la Ley Núm. 62, ante, es decir, si "el Gobernador del Estado Libre Asociado de Puerto Rico ... creyere conveniente para los mejores intereses del Estado Libre Asociado ... sujeto a las condiciones que se estipulan [en esta ley] y a las demás condiciones que estime convenientes. La jurisdicción sobre tales terrenos por parte del Estado Libre Asociado de Puerto Rico, continuará, sin embargo, hasta que el indicado funcionario haya aceptado, en representación de Estados Unidos, la cesión de jurisdicción y haya radicado en la Oficina del Gobernador una notificación a tal efecto". 28 L.P.R.A. sec. 55. Véase *Roberts v. U.S.O. Council of Puerto Rico*, ante, pág. 65.

([17]) En *Capitol Construction v. Srio. de Hacienda*, 89 D.P.R. 326 (1963), nos enfrentamos a una controversia un tanto distinta a la que se plantea en el presente caso. En dicho caso se cuestionó la validez de la imposición de una contribución sobre la propiedad mueble —equipos de construcción, enseres y herramientas— de un contratista que realizaba trabajos de construcción en bases militares de Estados Unidos en Puerto Rico —Ramey Fields y Roosevelt Roads— propiedad mueble que se hallaba ubicada en dichas instalaciones militares. Resolvimos que no era procedente dicha contribución, ya que Puerto Rico carecía de autoridad o facultad impositiva para así hacerlo.

([18]) Para fines de la Ley Buck, el concepto *estado* incluye cualquier territorio o posesión de Estados Unidos. 4 U.S.C.A. sec. 110(d).

des llevadas a cabo en una jurisdicción o enclave federal.[19] *P.R. Drydock, etc. v. Srio. de Hacienda*, 82 D.P.R. 658, 663 (1961). Véanse, además: *United States v. Lewisburg Area Sch. Dist.*, 539 F.2d 301, 309 (3er Cir. 1976); *General Dynamics Corp. v. Bullock*, 547 S.W.2d 255 (1976); *City of Portsmouth v. Fred C. Gardener Co. Inc.*, 211 S.E.2d 259 (1975); *Humble Oil & Refining Co. v. Calvert*, 478 S.W.2d 926 (1972); *State of Alaska v. Baker*, 390 P.2d 1009 (1964).

En virtud del antes mencionado estatuto, entre otras cosas, los estados están autorizados a cobrar impuestos en enclaves federales[20] *siempre que se trate de "contribuciones sobre ingresos"*. 4 U.S.C.A. sec. 106. A tales efectos, la Ley Buck define el término *"contribución sobre ingresos"* como *cualquier* contribución que se imponga sobre, con respecto a, o que se mida, por el ingreso neto, el ingreso bruto o las entradas brutas. 4 U.S.C.A. sec. 110(c).[21]

Varios tribunales, tanto federales como estatales, *han destacado que el Congreso de Estados Unidos, al aprobar la Ley Buck, tuvo la intención de definir el concepto "contribución sobre ingresos" dentro de un marco amplio y abarcador.* Véanse: *United States v. City and County of*

---

[19] El Tribunal Supremo de Estados Unidos ha señalado que los estados pueden, en virtud de su absoluta discreción, crear entidades gubernamentales —tales como condados o ciudades— para que lleven a cabo los poderes gubernamentales que le han sido delegados. *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 608–609 (1991); *Sailors v. Board of Education*, 387 U.S. 105, 108 (1967), citando a *Reynolds v. Sims*, 377 U.S. 533 (1964); *Hunter v. Pittsburg*, 207 U.S. 161 (1907). En virtud de lo anterior, los municipios tiene la potestad de llevar a cabo las facultades que le otorga a Puerto Rico la Ley Buck.

[20] La Ley Buck, 4 U.S.C.A. sec. 106, establece, en lo aquí pertinente, que:

"(a) No person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, by reason of his residing within a Federal area or receiving income from transactions occurring or services performed in such area; and such State or taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area."

[21] Específicamente, esta sección de la Ley Buck establece lo siguiente:

"The term *'income tax' means any tax levied on, with respect to, or measured by, net income, gross income, or gross receipts.*" (Énfasis nuestro.) 4 U.S.C.A. sec. 110(c).

*Denver*, 573 F. Supp. 686, 691–692 (1983); *United States v. Lewisburg Area Sch. Dist.*, ante; *City of Portsmouth v. Fred C. Gardener Co. Inc.*, ante; *Humble Oil & Refining Co. v. Calvert*, ante. A esos efectos, resulta ilustrativo el Informe del Comité de Finanzas del Senado, en el cual se estableció que:

> This definition (of income tax) ... *must of necessity cover a broad field because of the great variations to be found between the different State laws.* The *intent of your committee in laying down such a broad definition was to include therein any State tax* (whether known as a corporate-franchise tax, or business privilege tax, or any other name) if it is levied on, with respect to, or measured by net income, gross income, or gross receipts. (Énfasis nuestro.) Report of the Senate Finance Committee of May 16, 1940, pág. 5; 76th Congress, 3rd. Session; Report No. 1625, Calendar No. 1692.

Como vemos, *no* hay duda que al aprobar esta ley el Congreso tuvo la *clara intención* de darle una *definición amplia* al antes mencionado concepto, aunque no estableció una lista sobre qué tipo de impuestos están incluidos dentro del concepto "contribución sobre ingresos", según definido por la Ley Buck. Examinamos la jurisprudencia federal y estatal con el propósito de delimitar el alcance y el significado de dicho concepto.

El Tribunal Supremo de Estados Unidos ha establecido *que la determinación respecto a si un tributo impuesto por un estado, territorio o posesión es una contribución sobre ingresos, al amparo de las disposiciones de la Ley Buck, es un cuestión federal y no estatal.* Véase *Howard v. Commissioners*, 344 U.S. 624, 629 (1953).

Específicamente, en *Howard v. Commissioners*, ante, el referido Tribunal se enfrentó a la controversia de si era válido un arbitrio impuesto por la ciudad de Louisville, Kentucky, sobre unos empleados en un enclave federal.[22]

---

[22] El enclave federal era una fábrica militar, sita en unos terrenos que el Gobierno de Estados Unidos había adquirido, con el consentimiento de la Legislatura de Kentucky, desde 1940. En virtud de ello, *el Gobierno de Estados Unidos tenía jurisdicción exclusiva sobre el área.*

El referido arbitrio se cobraba anualmente *por el privilegio de trabajar en la ciudad* y, a su vez, se calculaba a base del uno por ciento de (a) todos los salarios, jornales o comisiones generados en la ciudad, y (b) de las ganancias netas (*net profits*)([23]) de todos los negocios llevados a cabo en la ciudad.

Una mayoría de los integrantes del referido foro federal *enfatizó que el asunto por resolver era si el arbitrio en cuestión era una contribución sobre ingresos dentro de la definición de la Ley Buck.* A esos efectos, se expresó lo siguiente:

> Was this tax an "income tax" within the meaning of the Buck Act? In a prior case, Kentucky had held this tax was not an 'income tax' within the meaning of the Constitution of Kentucky but was a tax upon the privilege of working within the City of Louisville. *But the right to tax earnings within the area was not given Kentucky in accordance with the Kentucky law as to what is an income tax. The grant was given within the definition of the Buck Act,* and this was for *any* tax measured by net income, gross income, or gross receipts. In the instant case, the Kentucky Court of Appeals correctly stated that *the question was whether the tax was an income tax within the meaning of the federal law.* (Citas omitidas y énfasis nuestro.) *Howard v. Commissioners,* ante, págs. 628–629.

La mayoría del mencionado Tribunal determinó que el arbitrio objeto del litigio era una *"contribución sobre ingresos"* al amparo del significado de la Ley Buck, por lo cual podía ser válidamente impuesto por la ciudad.([24])

---

([23]) "Net profits" se traduce al español como "ganancias netas". S.M. Kaplan, *Wiley's English-Spanish, Spanish-English, Legal Dictionary,* 2da ed., Nueva York, Wiley Law Publications, 1997, pág. 208.

([24]) Por otro lado, el Juez Douglas disintió del antes mencionado resultado, opinión con la cual el Juez Black concurrió. Señaló que el arbitrio en este caso era por sus propios términos un impuesto pagadero para una licencia (*license fee*) impuesto sobre el privilegio de realizar ciertas actividades. Conforme a ello, argumentó:

"The tax is narrowly confined to salaries, wages, commissions and to the net profits of businesses, professions, and occupations. Many kinds of income are excluded, e.g., dividends, interests, capital gains. The exclusions emphasize that the tax is on the privilege of working or doing business in Louisville." (Énfasis suprimido.) *Howard v. Commissioners,* 344 U.S. 624, 629 (1953).

En *Jefferson County v. Acker*, 527 U.S. 423 (1999), el Condado de Jefferson, Alabama,([25]) instó una acción contra unos jueces de distrito federal que se negaban a pagar un impuesto a ocupaciones (*occupational tax*),([26]) bajo el fundamento de que éste violaba la doctrina de inmunidad contributiva intergubernamental.

El impuesto, según definido por la Ordenanza del Condado, se imponía a cualquier persona que estuviese trabajando en la ciudad, a la cual de otra manera no se le requiere el pago de un impuesto pagadero para una licencia (*license fee*). Es decir, el impuesto se imponía por el derecho de trabajar en la ciudad. A su vez, el impuesto tenía que *ser pagado antes de realizar la profesión, ocupación, oficio o vocación y antes de devengar ingreso alguno*, debido a que era ilegal realizar las antes mencionadas actividades sin pagar el correspondiente impuesto. La referida ordenanza, incluso, imponía sanciones a toda persona que incumpliera con lo dispuesto en ésta. Específicamente, el impuesto se calculaba a base del medio por ciento de todos los ingresos brutos o entradas brutas (*gross receipts*) del contribuyente, concepto que la ordenanza definió como compensación, salarios, jornales, comisiones o bonos, o ambos.

El estatuto federal aplicable a la controversia era el *Public Salary Tax Act*, 4 U.S.C.A. sec. 111.([27]) Específica-

---

([25]) Precisa señalar que Alabama no había autorizado a sus condados a recaudar contribuciones sobre ingresos. No obstante, los había autorizado a imponer impuestos pagaderos para una licencia (*license or privilege tax*). En virtud de esa autorización, el condado de Jefferson aprobó la ordenanza de la cual surge el impuesto en controversia.

([26]) "Occupational tax" se traduce al español como "impuesto a ocupaciones" o "licencia fiscal". Kaplan, *op. cit.*, pág. 218.

([27]) A través de esta pieza legislativa, el Congreso autorizó a los estados a cobrar contribuciones no discriminatorias a los empleados federales. Específicamente, el estatuto establece lo siguiente:

"*The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States*, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation." 4 U.S.C.A. sec. 111.

mente, el Tribunal Supremo de Estados Unidos tuvo que determinar, entre otras cosas y en lo aquí pertinente, si el impuesto en cuestión constituía una contribución sobre ingresos, ya que el aludido estatuto federal sólo autorizaba a la imposición de contribuciones sobre paga o compensación.

Una mayoría de los integrantes del Tribunal Supremo federal acudió, por analogía, a lo resuelto en *Howard v. Commissioners*, ante —al amparo de la Ley Buck— para establecer que en efecto el impuesto en cuestión era una "contribución sobre ingresos". A tales efectos, la Mayoría indicó que la contribución objeto del litigio en *Howard v. Commissioners*, ante, era similar en aspectos relevantes al impuesto de Jefferson. Específicamente, destacó que en *ese caso se determinó que un impuesto pagadero para una licencia ("license fee") era una contribución sobre ingresos para los fines de la Ley Buck, aun cuando se desviaba de lo que usualmente era una contribución sobre ingresos.* A esos efectos, se expresó que:

> In *Howard v. Commissioners of Sinking Fund of Louisville*, 344 U.S. 624 (1953), the Court held that a "license fee" similar in relevant respects to Jefferson County's was an "income tax" for purposes of a federal statute that defines "income tax" as "any tax levied on, with respect to, or measured by, net income, gross income, or gross receipts," 4 U.S.C. [sec.] 110(c). *The Court so concluded even though the local tax was styled as "a tax upon the privilege of working within [the municipality]," was not an "income tax" under state law, and deviated from textbook income tax characteristics.* (Citas omitidas y énfasis nuestro.) *Jefferson v. Acker*, ante, pág. 438.

Es de notar que el referido Tribunal acudió a lo resuelto en *Howard v. Commissioners* para determinar que el impuesto pagadero para una licencia ("license fee") era un método de recaudación de ingresos, *sin tener un propósito regulador sobre las profesiones u ocupaciones.* A esos efectos se expresó que:

> Alabama's enabling Act does not allow its counties to so pro-

vide; those otherwise subject to license or privilege taxes under Alabama's laws may not be reached by a county's occupational tax. See 1967 Ala. Acts 406, [Sec.] 4. The dispositive measure, however, is the Public Salary Tax Act, *which does not require the local tax to be a typical "income tax." Just as the statute in* Howard *consented broadly to* "any tax *measured by net income, gross income, or gross receipts,"* 344 U.S., at 629, the Public Salary Tax Act consents to any tax on "pay or compensation," which Jefferson County's surely is. The sole caveat is that the tax "not discriminate ... because of the [federal] source of the pay or compensation," 4 U.S.C. [sec.] 111. (Énfasis nuestro.) *Jefferson v. Acker,* ante, págs. 441–442.

■ *En conclusión,* el Tribunal Supremo de Estados Unidos ha avalado una definición, *amplia y abarcadora,* del concepto "contribución sobre ingresos", con la consecuencia de que impuestos que usualmente no son considerados como contribuciones sobre ingreso, a la luz de la definición común de lo que significa el referido término, están cobijados por la autorización amplia contenida en la Ley Buck.[28]

Dicho curso decisorio ha sido reiterado en decisiones de varios tribunales, tanto estatales como federales, que han determinado que ciertos impuestos que tradicionalmente

---

[28] En este caso, el Juez Breyer disintió exponiendo cuatro razones por las cuales consideraba que el impuesto en controversia era un impuesto pagadero por una licencia (*license fee*), y la Juez O'Connor se unió a lo esbozado en ésta. De esta forma, señaló que el impuesto era inconstitucional, ya que lo único que permitía el *Public Salary Act* era la imposición de una contribución sobre ingresos. A esos efectos, y en lo pertinente al caso ante nos, primeramente señaló que el lenguaje, la estructura y el propósito de la ordenanza indicaban que lo que se imponía era un cargo por llevar a cabo una actividad y no una contribución sobre ingresos. Específicamente, señaló que el propósito de la Ordenanza era establecer un impuesto por el privilegio de llevar a cabo una actividad dentro de la ciudad. De igual forma, indicó que el lenguaje de la Ordenanza se expresa en términos de una condición que se impone por trabajar, y una contribución que se impone sobre ingresos. Segundo, indicó que según era calculado el impuesto, es más un impuesto pagadero por una licencia (*license fee*) que una contribución sobre ingresos. Específicamente señaló que la razón por la cual se imponía el impuesto no era por ingresos devengados, sino por desempeñar cierto trabajo. Tercero argumentó que existían muchas excepciones al impuesto, lo cual sólo tenía sentido si la contribución era parte de un esquema estatal de imposición de impuestos pagaderos para licencias. Por último, alegó que la ordenanza de Jefferson imponía cargas directamente sobre el Gobierno federal que limitadamente exceden aquellos impuestos por una contribución sobre ingreso estatal o local.

no son considerados como contribuciones sobre ingresos, están cobijados por la definición amplia y abarcadora que de ese término dispone la Ley Buck. Veamos.

En *State of Alaska v. Baker*, ante, el Tribunal Supremo de Washington sostuvo la validez de un estatuto[29] que autorizaba la imposición de un impuesto pagadero para una licencia de negocios (*business license tax*)[30] a unos contratistas independientes que trabajaron dentro de una reserva militar en Alaska, mediante contratos con el Gobierno de Estados Unidos. El referido foro determinó lo anterior, *aun cuando* todos los trabajos fueron realizados exclusiva y completamente dentro de la aludida reserva y el impuesto tenía que ser pagado previo al comienzo de la obra.

Luego de indicar que la interrogante principal en el caso era si el estatuto en cuestión estaba dentro del alcance de la Ley Buck, el referido foro estatal —citando a *Howard v. Commissioners*, ante, y destacando que la medida de Alaska no era significativamente diferente a la que estaba en controversia en el aludido caso— determinó que el impuesto en cuestión era una *contribución sobre ingresos* para los fines del referido estatuto federal. Cónsono con ello, concluyó que era válido el estatuto, ya que era básicamente un método de recaudación de ingresos permitido por la Ley Buck y no una medida regulatoria.

En *Humble Oil & Refining Co. v. Calvert*, ante, el Tribunal Supremo de Texas se enfrentó, en lo aquí pertinente, a la interrogante de si el estado de Texas estaba autorizado —al amparo de la Ley Buck— a cobrar un impuesto sobre una compañía que, por un arrendamiento con el Gobierno de Estados Unidos, extraía petróleo o gas dentro de un

---

[29] La pieza legislativa en controversia era el *Alaska Bussiness Tax Act*, 43 Alaska Statutes Sec. 43.70.010 *et seq.*

[30] *License tax* se traduce al español como impuesto pagadero para una licencia. Kaplan, *op. cit.*, pág. 182.

enclave federal.([31]) El impuesto en cuestión era denominado según el estatuto de Texas como un impuesto a ocupaciones (*occupational tax*) por llevar a cabo la antes mencionada actividad dentro de la ciudad. *Éste se calculaba a base del valor en el mercado del mineral, sin importar si el gas o el petróleo hubiesen sido vendidos, utilizados o simplemente descartados.*

El referido foro estatal, luego de destacar que la intención del Congreso al aprobar la Ley Buck había sido definir ampliamente el concepto *contribución sobre ingresos*, señaló lo siguiente:

> The Buck Act *"income tax", broadly defined as it is, refers to the broad generic class of taxes upon income. It does not require that the tax be denominated an income tax or that it conform to the federal income tax.* If the tax in question is based upon income and is measured by that income in money or money's worth, as a net income tax, gross income tax, or gross receipts tax, it is an "income tax." (Énfasis nuestro.) *Humble Oil & Refining Co. v. Calvert*, ante, pág. 930.([32])

El mencionado foro indicó que, *independientemente de*

---

([31]) Específicamente, el enclave federal era la Base Naval Corpus Christi. En 1940 el gobernador de Texas cedió la jurisdicción exclusiva del referido terreno al Gobierno de Estados Unidos.

([32]) Indicó, además, con respecto a qué podía ser considerado como una *contribución sobre ingresos*, lo siguiente:

"We are here dealing *with a particular statutory definition of an 'income tax' in a particular context, and not with any sort of common understanding of an 'income tax.'* 'Income taxes,' or taxes on income, describe a generic class of taxes in which the base or measure is income ....

*"A particular 'income tax' may, of course, define its base more narrowly and selectively than the broadest definition of income.* A·particular income tax may select different points in time at which the income will be recognized, such as the time of sale, time of receipt, time of manufacture or production, et cetera. *Whatever these differences, however, the tax does not cease to be an income tax".* (Énfasis nuestro.) *Humble Oil & Refining Co. v. Calvert*, 478 S.W. 2d 926, 929 (1972).

A su vez, con respecto al término *ingreso*, el referido foro destacó lo siguiente:

*"'Income' is variously described as the flow of goods, services, property or other wealth during a definite period of time. It may be considered as the money, or money's worth which comes during a definite period.* It is to be distinguished from capital, which is a fund of wealth at a particular time. See Seligman, Income Tax, 7 Encyclopedia of the Social Sciences 628-631 (1932). *The essence of income is an inflow constituting an accretion to wealth, identifiable and measurable in money or money's worth, though not necessarily in cash."* (Énfasis nuestro.) Íd.

*la denominación que se le pudiera dar a un impuesto, si el referido impuesto se medía a base a los ingresos recibidos era una contribución sobre ingresos al amparo de la Ley Buck.* A esos efectos, y reafirmando la decisión emitida por el Tribunal Supremo federal en *Howard v. Commissioners,* ante, expresó:

> Over the dissent of Justices Douglas and Black, the Court held that it did not matter that the tax involved was not an "income tax" by Kentucky law. *It emphasized that the Buck Act definition applied to any tax, and the word "any" was italicized in the Court's opinion.* If any tax came within the Buck Act's definition of income tax, it was permissible to the State. Since the tax there involved was measured by, and levied with respect to, the income from the taxed activity, it was a Buck Act income tax even though not denominated or classified as an income tax under local law. (Énfasis en el original suprimido y énfasis nuestro.) *Humble Oil & Refining Co. v. Calvert,* ante, pág. 931.

En *City of Portsmouth v. Fred C. Gardener Co. Inc.,* ante, el Tribunal Supremo de Virginia resolvió que la ciudad de Portsmouth podía válidamente cobrarle un impuesto pagadero por una licencia de negocios (*business license tax*) a un contratista que edificó unas mejoras en una reserva militar, por medio de un contrato de ejecución de obra con el Gobierno de Estado Unidos. Específicamente, el impuesto se cobraba por llevar a cabo, entre otras cosas, negocios, ocupaciones y oficios. El aludido impuesto se calculaba a base de los ingresos o entradas brutas (*gross receipts*) del negocio del contratista.

Al resolver la controversia ante sí, el referido foro indicó, entre otras cosas, que el Tribunal Supremo de Estados Unidos ya había resuelto una controversia similar en *Howard v. Commissioners,* ante. De este modo, enfatizó que para establecer si el arbitrio en cuestión era una contribución sobre ingresos, tenía que acudir a la definición provista por la Ley Buck. A esos efectos, citando a *Humble Oil & Refining Co. v. Calvert,* ante, señaló:

The Buck Act *"income tax," broadly defined as it is, refers to the broad generic class of taxes based upon income.* It does not require that the tax be denominated an income tax or that it conform to the federal income tax. *If the tax in question is based upon income and is measured by that income in money or money's worth, as a net income tax, gross income tax, or gross receipts tax, it is an income tax.* (Énfasis nuestro.) *City of Porthmouth v. Fred C. Gardner Co., Inc.*, ante, pág. 262.

Nuevamente, en *General Dynamics Corp. v. Bullock*, ante, el Tribunal Supremo de Texas se enfrentó a la interrogante de si el estado podía válidamente imponer un impuesto sobre franquicias (*franchise tax*)[33] a General Dynamic, una corporación privada[34] que llevaba a cabo su negocio primordialmente en un enclave federal en Texas.[35]

Específicamente, la controversia surgió debido a que el estado de Texas catalogó los ingresos brutos (*gross receipts*) de la corporación dentro del enclave como ingresos obtenidos en Texas. El estado de Texas adujo que la Ley Buck había autorizado el cobro de contribuciones sobre ingreso en actividades de negocios —como las que realizaba General Dynamic— dentro de enclaves federales.

En virtud de la intención del Congreso al aprobar la Ley Buck y por los fundamentos expresados en *Humble Oil & Refining Co. v. Calvert*, ante, el referido foro estatal determinó que el impuesto era una contribución sobre ingresos para la Ley Buck, ya que el impuesto en cuestión podía ser visualizado como una contribución impuesta por el beneficio económico de llevar a cabo negocios en el estado. A esos efectos expresó:

Under the analysis in *Humble Oil Refining Company v. Cal-*

---

[33] *Franchise tax* se traduce al español como impuesto corporativo o derecho de licencia. Kaplan, *op. cit.*, pág. 126.

[34] General Dynamics estaba primordialmente dedicada a la manufactura y venta de suministros y equipos para defensa.

[35] Específicamente, el enclave federal se encontraba en el Condado de Tarrant dentro del estado de Texas y era conocido como Air Force Plant No.4. El aludido terreno fue arrendado a General Dynamic por el Gobierno federal.

*vert,* supra, the granting of the privilege to transact business in the State of Texas represents *the realization of gross income to the General Dynamics Corporation because an economic benefit flows to the Corporation.*

These economic benefits which flow from the granting of the privilege include the opportunity to transact intrastate business and the right to invoke the protection of the local government. The formula used in the franchise tax is the valuation of the privilege granted by the Legislature. (Citas omitidas y énfasis nuestro.) *General Dynamics Corp. v. Bullock,* ante, pág. 258.

Un año más tarde, en *United States v. Lewisburg Area Sch. Dist.,* ante, el Tribunal del Tercer Circuito de Apelaciones determinó que un distrito escolar podía imponer ciertas contribuciones locales a unos empleados federales y a sus familiares que residían en el enclave federal.[36] Uno de los impuestos era un impuesto ocupacional (*occupational tax*) que se imponía a base de tres criterios, a saber:

... one, by a levy of a fixed amount against each occupation, with the variation in the levy on each class based on a rough calculation of the average relative income of each occupation; second, by placing a value on each occupation and levying a milage rate against that value, the values being obtained from statistical evidence of the average income earned in each occupation; a third method is to assess each taxpayer's occupation by the yield of that taxpayer from his occupation in a certain number of prior years. *United States v. Lewisburg Area Sch. Dist.,* ante, pág. 310.

Al igual que en *Humble Oil & Refining Co. v. Calvert,* ante, se indicó que el informe del Senado con respecto a la Ley Buck enfatizó que la definición de *contribución sobre ingresos* fue diseñada para cubrir una gran variedad de contribuciones debido a la gran variedad de contribuciones que existen en los diferentes estados y que la intención de la comisión era incluir cualquier contribución del Estado,

---

[36] El enclave federal era conocido como Lewisburg Federal Penitentiary. En 1931 el referido enclave fue adquirido por Estados Unidos con el consentimiento de la legislatura de Pensilvania, la cual consintió la adquisición y de igual forma cedió la jurisdicción sobre el terreno adquirido.

no importa cuál fuera su denominación. A su vez, el referido foro indicó, citando tanto a *Howard v. Commissioners*, ante, como a *Humble Oil & Refining Co. v. Calvert*, ante, y a *City of Portsmouth v. Fred C. Gardener Co., Inc.*, ante, que en virtud del propósito de la ley y de la amplia definición de *contribución sobre ingresos*, muchas contribuciones estatales que no eran denominadas como contribuciones sobre ingresos y que no se ajustaban a la contribución sobre ingresos federal, habían sido consideradas como contribuciones sobre ingresos para fines de la Ley Buck.[37]

▮ Surge de todo lo anteriormente expuesto *que el término "contribución sobre ingresos", al amparo de la Ley Buck, es amplio, abarcador y no circunscrito a lo que habitualmente se conoce como una "contribución sobre ingresos"*. Esto es, contribuciones estatales son consideradas válidas, al amparo de la Ley Buck, aun cuando no hayan sido denominadas *contribuciones sobre ingresos* bajo el derecho estatal y aun cuando no sean calculadas, específicamente, conforme a lo que tradicionalmente se conoce como un ingreso.

### III

▮ En el presente caso, y conforme a la legislación vigente en Puerto Rico, el arbitrio de construcción *debe pagarse al municipio donde se lleve a cabo dicha obra, previo a la fecha de su comienzo.* Art. 2.002(d) de la Ley de Municipios Autónomos, ante.

El referido arbitrio *"recae sobre el derecho de llevar a cabo una actividad de construcción y/o una obra de construcción dentro de los límites territoriales del municipio".*

---

[37] Específicamente, el referido foro señaló lo siguiente:

"In view of the purpose of the act and the broad definition of 'income tax' found therein, many state taxes which are not denominated as income taxes and which do not conform to the federal income tax have been held

to be income taxes for the purposes of the Buck Act." *United States v. Lewisburg Area Sch. Dist.*, ante, pág. 309.

21 L.P.R.A. sec. 4001(cc). Específicamente, el antes mencionado arbitrio *se impone sobre el costo total de la obra.* 21 L.P.R.A. sec. 4052(d).

■ El *costo total de la obra* se define como "el costo en que se incurra para realizar el proyecto luego de deducirle el costo de adquisición de terrenos, edificaciones ya construidas y enclavadas en el lugar de la obra, costos de estudios, diseños, planos, permisos, consultoría y servicios legales". 21 L.P.R.A. sec. 4052(d). De esta manera, se excluyeron las partidas que no constituían una actividad directa de construcción y que ocurrían antes de comenzar la obra o construcción, evitando así una carga onerosa para el diseño de la obra antes de que ésta fuera realizada. Informe de la Comisión de Asuntos Municipales y de la Comisión de Hacienda de la Cámara de Representantes con respecto al P. de la C. 1938 de 8 de mayo de 1996, págs. 22–23.

■ El referido arbitrio puede ser pagado por el dueño de la obra —si es quien está ejecutando la obra de construcción— o por el contratista. Específicamente, cuando es el contratista quien paga el referido arbitrio, éste podrá *"formar parte del costo de la obra".* (Énfasis nuestro.) 21 L.P.R.A. sec. 4001(ee).

Para poder determinar la cuantía del referido arbitrio se multiplica el costo total de la obra por el tipo contributivo o la tasa contributiva que corresponda, según establecida por la ordenanza municipal correspondiente. Art. 2.007(b)(1) de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4057(b)(1). Específicamente, en este caso, conforme a la 4ta Sección (a) de la Ordenanza Núm. 8, ante, cualquier obra a la cual no le aplicara ninguna de las excepciones([38])

---

([38]) Las excepciones son las siguientes:

"(1) Cuando la obra a realizarse vaya a utilizarse como una residencia unifamiliar cuya construcción no sea parte de un proyecto de vivienda, de urbanización,

pagaría el dos y medio por ciento del costo total de la obra. A su vez, conforme a la 3ra Sección (A) de la Ordenanza Núm. 33, ante, pagaría, si no aplica ninguna de las excepciones,([39]) cuatro por ciento del costo total de la obra.

---

condominio u otro proyecto de similar naturaleza cuyo costo total sea de $50,000 o menos, se pagará un arbitrio de $25.00 por cada $5,000 o fracción del costo de la obra. Disponiéndose, que los primeros $10,000 estarán exentos del pago de arbitrios. Cuando la obra a realizarse se trate de un establecimiento comercial o agrícola cuyo costo sea de $50,000 o menos, se le aplicará también el arbitrio y exención dispuesto en este subinciso; de ser más de $50,000 se le aplicará lo dispuesto en el inciso A.

"(2) Cuando la obra a realizarse se trate de reparaciones, ampliaciones, demoliciones, alteraciones y mejoras a un costo de $10,000 o más, las obras descritas en el párrafo B-1 de esta sección o a residencias originalmente construídas bajo el inciso A de esta sección, se pagarán $25 por cada $5,000 o fracción del costo total de la obra. En todos los casos de residencias construídas originalmente bajo el inciso A, y los subincisos 1 y 2 del inciso B, los primeros $10,000 estarán exentos del pago de arbitrios.

"(3) No obstante cualquier disposición contenida en este apartado B, cuando la obra a realizarse se trate de la construcción, reparación, ampliación, demolición, alteración o mejora de una piscina, se pagará $300.00 o arbitrio provisto en el apartado A de esta sección, lo que sea mayor.

"(4) Cuando la obra a realizarse se trate del movimiento de tierras cuyo costo no esté incluido en el costo de cualquier obra de otra forma gravada por esta sección, se pagará el dos y medio por ciento (2.5%) del costo total de la obra.

"(5) Toda construcción de residencia principal y/o mejoras a la misma, estará exenta del pago de arbitrio." Sección 4ta inciso (B)(1), Ordenanza Municipal Núm. 8, Apéndice, pág. 165.

([39]) Las excepciones son las siguientes:

"(1) Cuando la obra se realizare y vaya a utilizarse como una residencia unifamiliar, cuya construcción no sea parte de un proyecto de vivienda, de urbanización, condominio u otro proyecto de similar naturaleza cuyo costo total sea de $50,000 o menos, se pagará un arbitrio de dos punto cinco (2.5%) por cada mil ($1,000) o fracción de mil dólares del costo de la obra, disponiéndose, que los primeros treinta mil ($30,000) estarán exentos del pago de arbitrios. De ser más de $50,000, le aplicará el uno por ciento (1%) al exceso de $50,000.

"(2) Cuando la obra a realizarse se trate de reparaciones, alteraciones y mejoras, cuyo costo sea de más de $10,000, se pagará cuatro dólares ($4.00) por cada mil ($1,000) o fracción adicional del costo total de la obra.

"(3) No obstante, cualquier otra disposición contenida en este apartado (B), cuando la obra a realizarse se trate de la construcción, reparación, ampliación, demolición, alteración o mejora de piscina, se pagará el arbitrio provisto en el apartado (A) de esta Sección.

"(4) Cuando la obra a realizarse se trate de movimiento de tierras, cuyo costo no esté incluido en el costo de cualquier obra de otra forma gravada por esta Sección, se pagará el 2.5% del costo total de la obra.

"(5) Toda construcción de residencia principal estará exenta del pago de arbitrios en los primeros $50,000. El exceso de $50,000, pagará punto cinco por ciento (.5%) por cada fracción de mil ($1,000)." Sección 3(B)(1-5), Ordenanza Municipal Núm. 33, Apéndice, pág. 17.

IV

En su primer señalamiento de error, la peticionaria alega que es inválida la imposición del arbitrio aquí en cuestión, ya que no constituye una *contribución sobre ingresos* según definida por la Ley Buck. Conforme a ello, argumenta que el arbitrio no podía ser válido debido a que la propia Ley de Municipios Autónomos reconocía que éste se imponía sobre el derecho (*fee*) que los municipios imponían por el derecho de llevar a cabo una actividad de construcción dentro de sus límites territoriales. Alegó, además, que no podía ser una contribución porque éste se computaba a base del costo en que se incurría para realizar el proyecto y no sobre ingresos.

De igual forma, alegó que el referido arbitrio se imponía al comienzo de la obra, momento en el que el contratista no había generado ingreso alguno. Por último, expuso, como segundo señalamiento de error, que era inválida la imposición del arbitrio en atención a la inexistencia de *quid pro quo*; es decir, que HBA, como contribuyente, no obtendría beneficio alguno a cambio del pago del aludido arbitrio. *No le asiste la razón.*

Como vimos, *para que la imposición del arbitrio sea válida lo único que es determinante es que pueda ser considerada como una "contribución sobre ingresos" al amparo de la Ley Buck.* No es determinante el hecho de que el arbitrio se imponga previo al comienzo de la obra o por el derecho de llevar a cabo cierta actividad dentro del municipio.

Como mencionamos, el arbitrio aquí en cuestión se calcula a base de un por ciento del costo total de la obra. El referido arbitrio puede ser pagado por el contratista o por el dueño de la obra. Ciertamente, cuando es el dueño el que paga el arbitrio, éste recaerá sobre los costos incurridos para llevar a cabo la obra. No obstante, cuando es el con-

tratista el que paga el arbitrio, éste recaerá sobre el ingreso bruto del contratista. Es decir, el costo total de la obra cuando es tributado al contratista constituye el ingreso bruto que recibe el contratista con respecto a los servicios prestados bajo el contrato de construcción.

Somos del criterio que el arbitrio de construcción impuesto por el Municipio a HBA es una *"contribución sobre ingresos,"* conforme la *amplia definición* de dicho concepto contenida en la Ley Buck, ante. Realmente no procede otra conclusión; ello en vista no sólo de la terminología de dicho estatuto, sino de la casuística, tanto federal como estatal, interpretativas de la Ley Buck. En consecuencia, resolvemos que dicho arbitrio procede en derecho.

## V

Por los fundamentos anteriormente expuestos, *procede dictar sentencia confirmatoria de la emitida por el Tribunal de Apelaciones, por lo que se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos de forma compatible con lo aquí resuelto.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Rivera Pérez no intervino.