EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| ECA General Contractors, Inc.<br><br>Recurrida<br><br>v.<br><br>Municipio Autónomo de Mayagüez<br><br>Peticionario | Certiorari<br><br>2018 TSPR 124<br><br>200 DPR \_\_\_\_ |

Número del Caso: CC-2014-1001


Fecha: 29 de junio de 2018


Tribunal de Apelaciones:

Región Judicial de Mayagüez-Aguadilla y Aibonito


Abogado del peticionario:

Lcdo. Efraín Colón Sanz


Abogado del recurrido:

Lcdo. Rebeca Barnes Rosich


Ley de Municipios Autónomos: Fecha determinante para la imposición del arbitrio de construcción en un proceso de requerimiento de propuestas. Delimitación de los contornos de la base contributiva del arbitrio de construcción.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


ECA General Contractors, Inc.

      Recurrida

         v.                 CC-2014-1001     *Certiorari*

Municipio Autónomo de Mayagüez

      Peticionario


La Jueza Presidenta Oronoz Rodríguez emitió la Opinión del Tribunal


En San Juan, Puerto Rico, a 29 de junio de 2018.

En esta ocasión, nos corresponde resolver cuál es la fecha determinante, al amparo de la Ley de Municipios Autónomos, infra, para la imposición del arbitrio de construcción en un proceso de requerimiento de propuestas. Además, precisa delimitar los contornos de la base contributiva de dicho impuesto con el fin de determinar qué desembolsos están sujetos a la contribución. Por los fundamentos que pasamos a exponer, resolvemos que el arbitrio de construcción se fija en el día de cierre del requerimiento. Asimismo, concluimos que los costos que tributan son aquellos que estén directamente relacionados a la actividad de construcción. A continuación los hechos que dieron

inicio a la controversia ante nuestra consideración.

I

La Autoridad para el Financiamiento de la Infraestructura (AFI) y la Autoridad para las Alianzas Público Privadas (AAPP) suscribieron un acuerdo interagencial mediante el cual la primera se comprometió a brindar apoyo técnico, administrativo y legal a la última en la consecución de un programa de modernización del sistema de enseñanza público.

A raíz del acuerdo, se efectuó un requerimiento de propuestas para el diseño, construcción y conservación del Centro Residencial de Oportunidades Educativas de Mayagüez (CROEM). El procedimiento de entrega de propuestas cerró el 18 de noviembre de 2011 a las 5:00 p.m. y, tras la evaluación correspondiente, la AFI concluyó que ECA General Contractors, Inc. (ECA) ofreció la mejor calidad por el valor sugerido y le adjudicó el proyecto de modernización del CROEM por la cantidad de $5,161,900.00. La contratación incluyó el diseño de la obra, su construcción, el suplido de ciertos equipos y materiales y la conservación de la obra por el término de un año luego de finalizada la construcción.

El Municipio Autónomo de Mayagüez (Municipio) advino en conocimiento de la remodelación del CROEM y obtuvo de la Oficina del Contralor una copia del contrato suscrito entre ECA y la AFI, la cual utilizó para calcular la obligación contributiva de ECA por concepto de arbitrios

de construcción. Como consecuencia del cómputo efectuado, el Municipio le remitió a ECA una notificación de deficiencia por concepto de arbitrios por la suma de $25,809.50, pues entendió que la obligación contributiva debió calcularse utilizando la tasa de 5%, según dispuesta en la Ordenanza Núm. 11, serie 2011-2012. En lo pertinente, dicha Ordenanza establece que "[s]e cobrará como arbitrio el cinco por ciento (5.0%) del costo total de la obra o actividad cubierta por esta Ordenanza". Sección 4ta, Ordenanza Municipal Núm. 11, serie 2011-2012.

Posteriormente, el Municipio le cursó a ECA una segunda notificación de deficiencia por la cantidad de $48,404.00 tras razonar que ECA dedujo del cómputo del arbitrio ciertas partidas no exentas de tributación. Apoyó su determinación en una lectura puntual de la Sección 2da de la Ordenanza Núm. 11, serie 2011-2012, la cual dispone que el costo total de la obra "es el costo en que se incurra para realizar el proyecto luego de deducirle el costo de adquisición de terrenos, edificaciones ya construidas y enclavadas en el lugar de la obra, costos de estudios, diseños, planos, permisos, consultorías y servicios legales".

Inconforme con la cuantía impuesta, ECA presentó una demanda contra el Municipio en la que solicitó la revisión de la contribución. Arguyó que el Municipio se equivocó en el cálculo del impuesto al utilizar una tasa contributiva que no estaba en vigor al momento de la adjudicación de la

subasta. Además, alegó que se incluyeron ciertas partidas exentas de tributación en el cómputo, tales como los costos atribuibles a conservación, estudios, gastos de oficina, equipos y computadoras.

Explicó que cuando la AFI cerró el requerimiento de propuestas para el diseño, construcción y conservación del plan de modernización del CROEM estaba vigente la Ordenanza Núm. 119, serie 2001-2002, que imponía un arbitrio de 4% sobre el costo incurrido en la obra de construcción. Por tanto, indicó que radicó una declaración de volumen de negocios tributables y pagó la suma de $238,375.91 por concepto de patentes y arbitrios relacionados al proyecto.

El Municipio contestó la demanda y negó que se hubiera celebrado una subasta pública. Alegó que la obra se adjudicó el 9 de marzo de 2012[1] mediante un procedimiento de requerimiento de propuestas, por lo que era de aplicación la Ordenanza Núm. 11, serie 2011-2012, pues ésta entró en vigor el 11 de febrero de 2012. Asimismo, arguyó que calculó el arbitrio de construcción conforme a derecho toda vez que el ordenamiento jurídico vigente enumera de forma taxativa los costos susceptibles de deducción y señaló que las deducciones solicitadas por

---

[1] Sin embargo, en su Moción en Oposición a Solicitud de Sentencia Sumaria, el Municipio indica que el contrato se otorgó el 11 de abril de 2012. Apéndice, pág. 412.

ECA eran improcedentes, pues no correspondían a ninguna de las exclusiones permitidas por ley.[2]

Tras varios incidentes procesales, ECA y el Municipio presentaron sendas mociones de sentencia sumaria. Examinadas las mismas, el foro primario determinó que el proceso de requerimiento de propuestas se encontraba incluido dentro del concepto de subasta pública. Por consiguiente, concluyó que la fecha determinante para la imposición del arbitrio era la del cierre de la subasta, por lo que el Municipio debió computar el arbitrio utilizando la Ordenanza Núm. 119, serie 2001-2002, la cual fijaba una tasa contributiva de 4%, y no la Ordenanza Núm. 11, serie 2011-2012, la cual se aprobó tras el cierre de la subasta.[3]

Además, el foro primario concluyó que el Municipio se excedió del poder delegado al imponer el arbitrio de construcción sobre el valor del contrato. Estimó que sólo son tributables aquellos costos directos atribuibles a la actividad de construcción por lo que dedujo de la base tributable la ganancia del contratista, las partidas

---

[2] En específico, aludió al Artículo 2.002 de la Ley de Municipios Autónomos, el cual dispone que:

> para los propósitos de la determinación del arbitrio de construcción, el costo de la obra será el costo en que se incurra para realizar el proyecto luego de deducirle el costo de adquisición de terreno, edificaciones ya construidas y
> enclavadas en el lugar de la obra, costos de estudios, diseño, planos, permisos, consultoría y servicios legales. 21 LPRA sec. 4052.

[3] Sentencia, Apéndice, págs. 60-62.

incluidas bajo el renglón de "General Conditions",[4] la transportación y adquisición de los equipos utilizados para el proyecto y los costos de conservación de la obra.

En atención a lo anterior, el Tribunal de Primera Instancia cuantificó el arbitrio correspondiente al proyecto en $122,524.74 y ordenó el rembolso de la suma pagada en exceso, la cual valoró en $121,201.55.

Inconforme, el Municipio apeló contra la sentencia. Alegó que el foro primario erró al dictar sentencia sumaria amparándose en la similitud entre la subasta y el requerimiento de propuestas, así como al determinar que las exclusiones establecidas en el Artículo 2.002 de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (Ley de Municipios Autónomos), 21 LPRA sec. 4052, son *numerus apertus*.

El foro apelativo intermedio confirmó al Tribunal de Primera Instancia. Al igual que el foro primario, concluyó que el mecanismo de requerimiento de propuestas está comprendido dentro del término de subasta pública y determinó que, para efectos del arbitrio de construcción municipal, "la fecha en que se cierra el requerimiento de propuestas, equivale a la fecha del cierre de la subasta".[5] De igual forma, razonó que el Municipio no tenía la facultad para imponer el impuesto sobre aquellas partidas que no constituyen una actividad directa de construcción.

---

[4] Éstas incluyen permisos y costos no asociados a la actividad de construcción.
[5] Sentencia, Apéndice, pág. 16.

Aún en desacuerdo, el Municipio interpuso un recurso de *certiorari* ante este Tribunal. En esencia, alega que erraron los foros recurridos al: (1) concluir que el proceso de subasta formal es análogo al procedimiento de requerimiento de propuestas; (2) concluir que la ganancia del contratista es un costo excluible de la base tributable del arbitrio de construcción; (3) concluir que las exclusiones provistas por la Ley de Municipios Autónomos, 21 LPRA sec. 4001 et seq., para el cálculo del arbitrio de construcción son *numerus apertus*; y (4) ordenar el rembolso de $121,201.55 por contribuciones cobradas en exceso.

Con el beneficio de la comparecencia de ambas partes, estamos en posición de resolver.

II

A

La contratación gubernamental de servicios está revestida del más alto interés público, pues persigue fomentar la inversión adecuada, responsable y eficiente de los recursos del Estado. Aut. Carreteras v. CD Builders, Inc., 177 DPR 398, 404 (2009).

La subasta formal es el vehículo procesal ordinariamente utilizado por el Estado en la adquisición de bienes y servicios. R & B Power v. E.L.A., 170 DPR 606, 620 (2007). El objetivo primordial de la subasta es brindarle protección al erario mediante el acceso a la construcción de obras públicas y la adquisición de

servicios de calidad para el Gobierno al mejor precio posible. RBR Const., S.E. v. A.C., 149 DPR 836, 848-849 (1999). Por consiguiente, la subasta gubernamental procura "establecer un esquema que asegure la competencia equitativa entre los licitadores, evite la corrupción y minimice los riesgos de incumplimiento". Aut. Carreteras v. CD Builders, Inc., supra, pág. 404; Véanse Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 DPR 864, 871 (1990); Justiniano v. E.L.A., 100 DPR 334, 338 (1971).

Nuestro ordenamiento jurídico no contiene un estatuto uniforme que regule la subasta gubernamental dirigida a la adquisición de bienes y servicios. RBR Const., S.E. v. A.C., supra, pág. 850. Por ello, corresponde a cada agencia ejercer su poder de reglamentación para establecer las normas que habrán de gobernar sus procedimientos de subasta. Aut. Carreteras v. CD Builders, Inc., supra, pág. 404.

De ordinario, el procedimiento de subasta pública formal consta de varias etapas, a saber: (1) la preparación de los pliegos de condiciones y especificaciones; (2) la publicación del aviso de subasta; (3) el recibo de las propuestas selladas y su posterior apertura pública; (4) la evaluación y estudio de las propuestas por el comité evaluador de la agencia; (5) la recomendación del comité respecto a la adjudicación de la buena pro; (6) la adjudicación de la subasta; y (7) la

notificación a los licitadores. R & B Power v. E.L.A., supra, pág. 621.

Una vez sometida la propuesta, el proceso no admite negociación entre la agencia y el licitador. Íd. A tales efectos, una de las particularidades de la subasta formal reside en la presentación sellada de las ofertas, lo cual garantiza la secretividad del procedimiento en la etapa anterior a la apertura de la licitación. Caribbean Communications v. Pol. de P.R., 176 DPR 978, 995 (2009). La secretividad es elemento indispensable para la existencia de una competencia leal y honesta, "pues impide que un postor enmiende su propuesta para superar la de un competidor". Íd.

Aunque la subasta tradicional se caracteriza por su formalidad y secretividad, esto no impide que la agencia adopte mecanismos que propicien el cumplimiento de las condiciones y requerimientos establecidos en los pliegos de especificaciones durante la etapa previa a la entrega de las licitaciones. A modo de ejemplo, el procedimiento de subasta formal puede incluir: (1) aclaraciones sobre cualquier ambigüedad en las especificaciones; (2) la celebración de reuniones pre-subasta; (3) inspecciones en el lugar donde se instalará el producto o equipo; y (4) el suministro de modelos o muestras que puedan asistir al licitador a entender las especificaciones de la agencia. Íd., págs. 995-996. La adopción de este tipo de medidas

posibilita la presentación de ofertas que se ajusten a las necesidades de la agencia correspondiente.

Por otra parte, el ente gubernamental también puede acudir al requerimiento de propuestas (también conocido como "RFP" por sus siglas en inglés) para la adquisición de bienes y servicios. R & B Power v. E.L.A., supra, pág. 621. De ordinario, se recurre a este procedimiento "cuando se trata de la adquisición de bienes o servicios especializados –que involucran asuntos altamente técnicos y complejos- o cuando existen escasos competidores cualificados". Íd., págs. 621-622. El requerimiento de propuestas es, ante todo, "un mecanismo de compra negociada" y, por lo tanto, admite la negociación entre los licitadores y la agencia durante la evaluación de las propuestas recibidas. Íd., pág. 621; Caribbean Communications v. Pol. de P.R., supra, pág. 997.

En el requerimiento de propuestas la agencia enumera los requisitos y factores que utilizará en la adjudicación del contrato en cuestión y a los cuales todo licitador tiene que responder. R & B Power v. E.L.A., supra, pág. 622. Generalmente, el ente gubernamental le adjudica un valor o peso a los factores que va a considerar al adjudicar la buena pro. Íd. Además, el requerimiento describe cómo se llevará a cabo el proceso, los términos del contrato que se otorgará y el itinerario para recibir, evaluar y adjudicar el contrato, lo cual facilita la

negociación entre la entidad gubernamental y el oferente. Íd.

Anteriormente hemos expresado que el criterio rector para determinar si en efecto hubo una negociación en un procedimiento de subasta mediante un RFP es si se le concedió al postor la oportunidad de revisar y modificar su propuesta. Caribbean Communications v. Pol. de P.R., supra, pág. 997. De no permitirse la modificación de la oferta, se entiende que la comunicación entre la entidad gubernamental y el licitador constituye una aclaración. Íd. La aclaración se efectúa mediante explicaciones realizadas en respuesta a preguntas efectuadas por la agencia o por el licitador y, a diferencia de la negociación, solo ofrece la oportunidad de aclarar ciertos asuntos sobre la propuesta presentada. Íd.

Así, el criterio central para determinar si medió una negociación es la conducta entre el ente gubernamental y el licitador y no la denominación utilizada por la agencia para describir la comunicación. Íd.

B

Nuestro ordenamiento jurídico confiere a la Rama Legislativa el poder impositivo del Estado. Interior Developers v. Mun. de San Juan, 177 DPR 693, 703 (2009). A tales efectos, nuestra Constitución dispone que "[e]l poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los

municipios se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido". Art. VI, Sec. 2, Const. E.L.A., LPRA, Tomo 1. A tenor con lo anterior, la Asamblea Legislativa, en el ejercicio de su poder constitucional, ostenta la facultad para delegar el poder impositivo del Estado a los municipios. Interior Developers v. Mun. de San Juan, supra, pág. 703. Por tratarse de un poder delegado, "los municipios no tienen un poder inherente, independiente del Estado, para imponer contribuciones". Levy, Hijo v. Municipio de Manatí, 151 DPR 292, 299 (2000).

El poder impositivo municipal quedó codificado en el Artículo 2.002 de la Ley de Municipios Autónomos, supra, que faculta la imposición de contribuciones, derechos, licencias y otros cargos análogos.[6] Una de las contribuciones autorizadas por dicha legislación es el arbitrio de construcción. Íd.

Esta es una contribución impuesta por los municipios, a través de una ordenanza municipal, que "recae sobre el derecho de llevar a cabo una actividad de construcción o una obra de construcción dentro de los límites territoriales del municipio". Art. 1.003(cc) de la Ley de Municipios Autónomos, 21 LPRA sec. 4001(cc); Interior Developers v. Mun. de San Juan, supra, pág. 704. En lo pertinente, la Ley señala que:

---

[6] La Ley de Municipios Autónomos se aprobó con el propósito de otorgar a los municipios un mayor grado de gobierno propio y autonomía fiscal. Muñiz Burgos, Inc. v. Mun. Yauco, 187 DPR 665, 675 (2013).

[t]oda obra de construcción dentro de los límites territoriales de un municipio, realizada por una persona natural o jurídica privada, o que sea llevada a cabo por una persona natural o jurídica privada a favor o en representación de, o por contrato o subcontrato suscrito con una agencia o instrumentalidad del Gobierno Central o municipal o del gobierno federal, incluyendo aquella obra que no requiera la solicitud o expedición de un permiso por la Administración de Reglamentos y Permisos o por un municipio autónomo, deberá pagar arbitrio de construcción correspondiente, previo al comienzo de dicha obra. Art. 2.002(d) de la Ley de Municipios Autónomos, supra.

De la disposición que precede se deriva que la obligación de pagar el arbitrio de construcción nace cuando concurren las circunstancias allí descritas, a saber: (1) que se trate de una obra de construcción; (2) que esté dentro de los límites territoriales del municipio; y (3) que la realice una persona natural o jurídica privada, o una persona natural o jurídica privada contratada por una agencia o dependencia del Gobierno Central, municipal o federal. Interior Developers v. Mun. de San Juan, supra, pág. 705.

Más aún, el Artículo también provee la fecha determinante para la imposición del arbitrio. A tales efectos, señala que "[e]l arbitrio de construcción municipal será el vigente a la fecha de cierre de la subasta debidamente convocada o a la fecha de la adjudicación del contrato para aquellas obras de construcción que no requieran subasta". Art. 2.002(d) de la Ley de Municipios Autónomos, supra. Por lo tanto, aquellos bienes y servicios tributables adquiridos por el

Gobierno mediante subasta estarán sujetos al pago del arbitrio existente al momento del cierre de la misma.

Es un principio firmemente establecido que la legislación contributiva no se interpreta de forma extensiva, sino de forma justa de modo que cumpla con sus propios términos. BBC Realty v. Secretario de Hacienda, 166 DPR 498, 511 (2005). Por ello, cuando una ley que impone contribuciones, impuestos o arbitrios es ambigua "se debe interpretar restrictivamente en contra del Estado y a favor del ciudadano". Íd., págs. 511-512.

La Ley de Municipios Autónomos dispone que el arbitrio de construcción recae sobre el costo total de la obra, luego de deducir "el costo de adquisición de terrenos, edificaciones ya construidas y enclavadas en el lugar de la obra, costos de estudios, diseños, planos, permisos, consultoría y servicios legales". Art. 2.002(d) de la Ley de Municipios Autónomos, supra. De esta manera, la Asamblea Legislativa optó por excluir aquellas partidas que no constituyen una actividad directa de construcción y que ocurren antes de comenzar la obra o construcción, evitando así una carga onerosa para el diseño de la obra. HBA Contractors v. Mun. de Ceiba, 166 DPR 443, 472 (2005); Informe de la Comisión de Asuntos Municipales y de la Comisión de Hacienda de la Cámara de Representantes con respecto al P. de la C. 1938 de 8 de mayo de 1996, págs. 22-23.

A la luz de este marco jurídico, resolvemos.

III

El Municipio sostiene que actuó correctamente al calcular el arbitrio de construcción utilizando la Ordenanza Núm. 11, serie 2011-2012. Apoya su contención en una lectura literal del texto del Artículo 2.002(d) de la Ley de Municipios Autónomos, supra, el cual señala que, para aquellas obras que no requieran subasta, el arbitrio de construcción municipal será el vigente a la fecha de la adjudicación del contrato.

En apretada síntesis, el Municipio arguye que la obra en cuestión se adjudicó mediante un requerimiento de propuestas, que el requerimiento de propuestas es un procedimiento fundamentalmente distinto al de subasta y que, por consiguiente, la fecha determinante en la imposición del arbitrio de construcción es la fecha en la que se adjudica el contrato. A tono con lo anterior, señala que el contrato se otorgó el 11 de abril de 2012, fecha para la cual la Ordenanza Núm. 11, serie 2011-2012, había entrado en vigor.

Como vimos, aunque son procedimientos distintos, el requerimiento de propuestas y la subasta formal "no son totalmente incompatibles". Caribbean Communications v. Pol. de P.R., supra, pág. 997. Estos persiguen un mismo fin cuando se trata de proyectos gubernamentales, a saber: proteger el erario mediante el acceso a bienes y servicios de calidad al mejor precio posible. RBR Const., S.E. v. A.C., supra, págs. 848-849. De ordinario, esto se alcanza

mediante el diseño de esquemas de adquisición que garanticen la libre competencia entre los licitadores, eviten la corrupción y minimicen los riesgos de incumplimiento. Íd. La transparencia brindada por dichos esquemas fomenta la participación de un mayor número de postores en las subastas gubernamentales, proveyéndole al Estado un mayor núcleo de licitadores cualificados para llevar a cabo sus proyectos, lo cual redunda en bienes y servicios de mayor calidad a un mejor precio.

Por la fundamentación anterior, coincidimos con los foros recurridos en cuanto a que el concepto de subasta del Artículo 2.002(d) de la Ley de Municipios Autónomos, supra, incluye el mecanismo de requerimiento de propuestas. Apoya nuestra determinación que en dicho artículo solo se incluyó el término subasta, sin especificar si se trataba del procedimiento formal o informal.

Según explicamos, el Artículo 2.002(d) de la Ley de Municipios Autónomos, supra, dispone que "[e]l arbitrio de construcción municipal será el vigente a la fecha de cierre de la subasta debidamente convocada".

En vista de que el cierre de la subasta, es decir, el procedimiento de entrega de propuestas ante nuestra consideración culminó el 18 de noviembre de 2011 a las 5:00 p.m., aplica la Ordenanza Municipal Núm. 119, serie 2001-2002, la cual fija una tasa contributiva de 4%, por

ser ésta la que estaba vigente, y no la Ordenanza Municipal Núm. 11, serie 2011-2012.

Más aún, cabe recordar que "cuando el contratista hace su oferta toma en consideración el monto de las imposiciones contributivas, sean éstas en forma de arbitrios, patentes o de cualquier otra forma, a los fines de determinar el precio de la obra, lo cual incluye todos los costos, más el margen de ganancia". Río Const. Corp. v. Mun. de Caguas, 155 DPR 394, 415 (2001). Asimismo, "las partes licitadoras no deben estar sujetas a la incertidumbre de un cambio en los arbitrios luego que se han movido a licitar conociendo cuál era el arbitrio al momento de formalizarse su oferta". Íd., pág. 416. Ante esta realidad, resulta irrazonable permitirle al Municipio imponer los arbitrios fijados en la Ordenanza Núm. 11, serie 2011-2012. Máxime cuando esa Ordenanza se aprobó luego de que los licitadores sometieran sus propuestas.

En segundo lugar, el Municipio sostiene que calculó el arbitrio de construcción conforme a derecho ya que el ordenamiento jurídico vigente enumera de manera taxativa los costos susceptibles de deducción. Fundamentándose en lo anterior, alega que las deducciones solicitadas por ECA son improcedentes pues no concuerdan con ninguna de las exenciones permitidas por ley.

Como vimos, el Artículo 2.002(d) de la Ley de Municipios Autónomos, supra, señala que "[p]ara los propósitos de la determinación del arbitrio de

construcción, el costo total de la obra será el costo en que se incurra para realizar el proyecto luego de deducirle el costo de adquisición de terrenos, edificaciones ya construidas y enclavadas en el lugar de la obra, costos de estudios, diseños, planos, permisos, consultoría y servicios legales". Al incorporar dicho lenguaje en el estatuto, la Asamblea Legislativa excluyó aquellas partidas que no constituyen una actividad directa de construcción y que ocurren antes de comenzar la obra o construcción, evitando así una carga onerosa para el diseño de la obra. HBA Contractors v. Mun. de Ceiba, supra, pág. 472; Informe de la Comisión de Asuntos Municipales y de la Comisión de Hacienda de la Cámara de Representantes con respecto al P. de la C. 1938 de 8 de mayo de 1996, págs. 22-23.

Más aún, resulta pertinente recordar que el precitado Artículo debe interpretarse de forma que armonice con la definición del impuesto provista por la Ley de Municipios Autónomos. A tales efectos, el Artículo 1.003 de dicha legislación define el arbitrio de construcción como "aquella contribución impuesta por los municipios a través de una ordenanza municipal aprobada con dos terceras partes para ese fin, la cual recae sobre el derecho de llevar a cabo una *actividad de construcción* o una *obra de construcción* dentro de los límites territoriales del municipio". Art. 1.003(cc) de la Ley de Municipios Autónomos, supra (énfasis suplido). En lo pertinente, el

Artículo de referencia define *actividad de construcción* como "el acto o actividad de construir, reconstruir, ampliar, reparar, demoler, remover, trasladar o relocalizar cualquier edificación, obra, estructura, casa o construcción de similar naturaleza fija y permanente, pública o privada, realizada entre los límites territoriales de un municipio".[7] Art. 1.003(dd) de la Ley de Municipios Autónomos, supra.

Por consiguiente, concluimos que el estatuto faculta la imposición del arbitrio sobre el costo de la actividad de construcción, según ésta es definida en la Ley, y no sobre toda partida incluida en el contrato de obra. En atención a lo anterior, concluimos que no se cometió el error imputado, pues el Municipio excedió el poder delegado al incluir en el cómputo del arbitrio los costos atribuibles a conservación, estudios, gastos de oficina,

---

[7] Por su importancia en el caso ante nos, procedemos a transcribir en su totalidad la definición de actividad de construcción provista por el Artículo 1.003(dd) de la Ley de Municipios Autónomos, supra:

Significará el acto o actividad de construir, reconstruir, ampliar, reparar, demoler, remover, trasladar o relocalizar cualquier edificación, obra, estructura, casa o construcción de similar naturaleza fija y permanente, pública o privada, realizada entre los límites territoriales de un municipio, y para la cual se requiera o no un permiso de construcción expedido por la Oficina de Gerencia de Permisos o por un municipio autónomo que posea tal autoridad. Significará, además, la pavimentación o repavimentación, construcción o reconstrucción de estacionamientos, puentes, calles, caminos, carreteras, aceras y encintados, tanto en propiedad pública como privada dentro de los límites territoriales de un municipio, y en las cuales ocurra [cualquier movimiento de tierra o en las cuales se incorpore] cualquier material compactable, agregado o bituminoso que cree o permita la construcción de una superficie uniforme para el tránsito peatonal o vehicular. Incluye cualquier obra de excavación para instalación de tubería de cualquier tipo o cablería de cualquier naturaleza y que suponga la apertura de huecos o zanjas por donde discurrirán las tuberías o cablerías dentro de los límites territoriales de un municipio.

equipos y computadoras ya que éstas partidas no constituyen una actividad de construcción.[8]

                            IV

Por los fundamentos antes expuestos, se confirma la Sentencia emitida por el Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.


                              Maite D. Oronoz Rodríguez
                                  Jueza Presidenta

---

[8] Para un desglose de los costos incurridos en el proyecto, véanse Apéndice, págs. 166-172.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

ECA General Contractors, Inc.

    Recurrida

        v.                 CC-2014-1001    *Certiorari*

Municipio Autónomo de Mayagüez

    Peticionario

SENTENCIA

En San Juan, Puerto Rico, a 29 de junio de 2018.

Por los fundamentos antes expuestos, en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se confirma la Sentencia emitida por el Tribunal de Apelaciones.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Kolthoff Caraballo concurre con el resultado sin opinión escrita. El Juez Asociado señor Estrella Martínez emite opinión disidente. La Juez Asociada señora Rodríguez Rodríguez disiente y emite la siguiente expresión:

> La Juez Asociada señora Rodríguez Rodríguez disiente por entender que el mero reconocimiento de un mecanismo de subasta híbrido se aparta del rigor que debe imperar en la contratación gubernamental y propende a una flexibilización indebida de las exigencias inherentes a los procesos de subasta en nuestra jurisdicción.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

ECA General Contractors, Inc.

    Recurrida

       v.                          CC-2014-1001     Certiorari

Municipio Autonómo de
Mayagüez

    Peticionario

Opinión disidente emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 29 de junio de 2018.

En esta ocasión nos correspondía decretar cuál es la fecha determinante para imponer el arbitrio de construcción correspondiente a una obra que se adjudicó mediante un proceso de requerimiento de propuestas negociado. Asimismo, debíamos precisar qué partidas debían ser excluidas del cómputo para fijar el referido tributo.

Una Mayoría de este Tribunal equipara el proceso de requerimiento de propuestas acaecido en este caso al de una subasta, en el contexto por el pago de arbitrios de construcción municipales, por lo que concluye erróneamente que procede la imposición del arbitrio

de construcción vigente al momento de la fecha de cierre del requerimiento de propuestas. A su vez, resuelve que procede descontar del cómputo de arbitrio de construcción ciertas partidas que no están contempladas en la Ley Núm. 81-1991, *infra.*

Por diferir de lo anterior, entiendo que opera la disposición estatutaria que impone el arbitrio de construcción vigente a la fecha de la firma del contrato. Asimismo, considero que el tributo procedía sobre ciertas partidas que fueron excluidas en la decisión que hoy avala la Mayoría de este Tribunal. A tenor con ello, disiento del curso de acción propuesto.

I

La controversia ante nuestra consideración tiene su génesis cuando el Municipio de Mayagüez (Municipio) le notificó a ECA General Contractors, Inc. (ECA) una deficiencia por el pago de arbitrios de construcción. La deficiencia notificada está relacionada al proyecto de modernización de la escuela CROEM ubicada en el referido Municipio.

A esos fines, es necesario adentrarnos en el proceso que tuvo lugar para la adjudicación del referido proyecto. Éste se realizó a tenor con la Ley Núm.29-2009, mejor conocida como *Ley de Alianzas Público Privadas*, 27 LPRA sec. 2601 *et seq.,* a través de la Autoridad para el Financiamiento de la Infraestructura (AFI). A esos efectos, se publicó una solicitud de cualificaciones para precualificar a aquellos proponentes interesados en

participar en los contratos relacionados con la prestación de diseño, construcción y conservación correspondientes al proyecto de *Modernización de Escuelas de Puerto Rico* conocido como *Escuelas del Siglo 21.* Como parte de ese proceso, se calificaron 125 proponentes. El 5 de octubre de 2011, se emitió un aviso de invitación para solicitud de propuestas (RFP, por sus siglas en inglés) a los proponentes calificados y luego se celebraron reuniones informativas y visitas de campo para el referido proyecto. El proceso para recibir la entrega de propuestas cerró el 18 de noviembre de 2011.

Para el proyecto se recibieron 5 ofertas formales y se detallaron los costos propuestos. Los proponentes eran ECA, Costamar Construction, Inc., Rama Construction, Karimar Construction, Corp. y CapCon, Corp. En lo pertinente, conforme surge del aviso de adjudicación de subasta, ECA propuso un valor total para el proyecto de $5,544,800.[9] El método de selección fue basado en un proceso de evaluación de propuestas de forma **competitiva** en diseño, construcción y conservación, cuyo costo reflejara una mayor calidad y valor por la inversión propuesta.[10]

Al evaluar las propuestas, se determinó que Costamar Construction, Karimar Construction, Corp. y ECA mostraban mejor calidad por el valor propuesto, por lo que se procedió

---

[9]El valor total propuesto equivale a $590,000 por el diseño, $4,343,200 por construcción, $470,000 por aditivas, y $141,600 por conservación.

[10]Véase Aviso de Adjudicación, Apéndice del recurso de *certiorari,* pág. 82.

a reunirse con éstos **"para negociaciones ulteriores"**.[11] (Énfasis suplido). Específicamente, se requirieron propuestas revisadas. De acuerdo con lo solicitado, ECA presentó su propuesta el 10 de enero de 2012. Luego de varias reuniones, AFI recibió las propuestas finales de los licitadores. Luego, se entendió que las propuestas revisadas que mejor se ajustaban a las necesidades eran las de Costamar Construction y ECA.

Posteriormente, AFI solicitó aclaraciones a las **propuestas revisadas** con relación al ámbito de trabajo. ECA presentó su **propuesta final revisada** el 9 de marzo de 2012. Al evaluar las propuestas revisadas, AFI determinó que ECA reflejaba mejor valor por calidad de trabajo en la **"propuesta final y firme del 9 de marzo de 2012"** para un total de $5,161,900.[12] Así las cosas, el 14 de marzo de 2012 se emitió la recomendación a favor de ECA, ya que ésta representaba mejor los intereses por la **"cantidad total negociada"**,[13] por lo que el contrato fue adjudicado a su favor el 11 de abril de 2012.

En cuanto a los arbitrios de construcción, ECA pagó $213,758.29. No obstante, el 10 de agosto de 2012, el Municipio notificó que los arbitrios de construcción

---

[11]Íd., pág. 83.

[12]Nótese que la propuesta original era por $5,544,800. El costo revisado es por $350,000 de diseño, $4,169,200 por construcción, $501,100 por aditivas y $141,600 por conservación. Adviértase que de la oferta inicial la única partida que no fue revisada fue la de conservación de la obra.

[13]*Véase*, Aviso de Adjudicación, Apéndice del recurso de *certiorari,* pág. 87.

ascendían a \$258,095.[14] Ello, al aplicar el arbitrio de construcción al 5%, según la Ordenanza Núm. 11, Serie 2011-2012, adoptada desde enero de 2012 por la Legislatura Municipal y efectiva desde el 11 de febrero de 2012. Posteriormente, el 11 de diciembre de 2012 notificó una deficiencia por el pago del arbitrio correspondiente de \$48,404.[15]

ECA cuestionó la deficiencia notificada al indicar que se utilizó el total de la cuantía del proyecto, sin deducir ciertos costos.[16] Tras evaluar la solicitud de ECA, el Municipio ajustó a \$29,968 la deficiencia notificada al excluir el gasto del diseño del cómputo para determinar el arbitrio de construcción.[17]

En desacuerdo, ECA acudió al Tribunal de Primera Instancia impugnando la deficiencia notificada. En síntesis, planteó que el arbitrio de construcción debía ser de 4% conforme a la ordenanza vigente al momento del cierre de la subasta, Ordenanza Núm. 119, Serie 2001-2002. A su vez,

---

[14]Es decir, el costo total de la propuesta por el 5% (\$5,161,900 x .05 = \$258,095).

[15]La deficiencia equivale al arbitrio determinado menos lo pagado por ECA (\$258,095-213,758= \$44,337). A eso se le suman los intereses (\$1,850) y adiciones (\$2,217) para una deficiencia total de \$48,404.

[16]En ese momento, ECA no cuestionó la imposición del arbitrio a base de la Ordenanza Núm. 11, Serie 2011-2012.

[17] Esta suma equivale a la deficiencia notificada menos la diferencia del arbitrio calculado por la partida de diseño [\$44,337-(\$350,000 x .05)]=\$26,837. A esa cantidad se le añade los intereses (\$1,789) y adiciones (\$1,342) para una deficiencia total de \$29,968.

reclamó que del costo de la obra debía reducirse, el diseño, el suplido de equipos, la conservación de ésta, y estudios, entre otros. Posteriormente, ECA solicitó que se dictara sentencia sumaria a su favor. Argumentó que el arbitrio de construcción sólo procede sobre aquellas actividades que constituyen construcción, por tanto, sostuvo que son los costos, dentro de los límites territoriales del Municipio, en los que incurre el contratista para realizar la actividad, los que componen la base tributable. De esta forma, aseveró que la ganancia del contratista,[18] los equipos, el diseño, los sellos del colegio de ingenieros, los gastos de consultoría y control de calidad, los permisos medioambientales, gastos de consulta legal y conservación, tampoco deben ser objeto del arbitrio de construcción, pues entiende que estas partidas no constituyen una actividad de construcción.[19] A su vez, arguyó que el arbitrio que corresponde es el de 4% establecido en la Ordenanza Núm. 119, Serie 2001-2002, pues era el vigente a la fecha del cierre de presentación de propuestas, por lo que el impuesto

---

[18]La ganancia del contratista se calculó a base del 20% del valor del contrato, menos diseño, conservación, equipos y otras partidas.[($5,161,900-350,000-141,600-160,000-681,402) x.20 =$765,779.60].

[19]En consecuencia, del valor del contrato ($5,161,900) rebajaría el diseño ($350,000), los costos de conservación ($141,600), de muebles y computadoras ($160,000), otras partidas de condiciones generales ($681,402) y la ganancia del contratista ($765,779.60) para una base tributable de $3,063,118.40.

asciende a $122,524.74.[20] Siendo ello así, solicitó el reembolso de $121,201.55, que alega pagó en exceso.[21]

El Municipio se opuso a que se dictara sentencia sumaria a favor de ECA. Por el contrario, argumentó que procedía dictarla a su favor. En esencia, sostuvo que el proceso de adjudicación del proyecto fue uno de negociación entre la agencia y los proponentes que culminó cuando ECA presentó su propuesta final el 9 de marzo de 2012. Así las cosas, razonó que no constituyéndose una subasta o un proceso análogo, procede imponer el arbitrio a la fecha de adjudicación del contrato. A ese momento, estaba vigente la Ordenanza Núm. 11, Serie 2011-2012, que imponía el 5% para el cómputo de arbitrios de construcción. Igualmente, el Municipio afirmó que la ley es clara en cuanto a las partidas que no forman parte del costo de construcción, limitándolas a la adquisición de terrenos, edificaciones construidas o enclavadas, costos de estudios, diseño, planos, permisos, consultoría y servicios legales. Por tanto, reiteró que no procede eximir del referido cómputo las partidas expuestas por la ECA.

Evaluadas las posturas de las partes, el Tribunal de Primera Instancia emitió la Sentencia a favor de ECA. El foro primario concluyó que la solicitud de propuestas está

---

[20]ECA calculó el arbitrio de construcción al 4% descontando todas las partidas de diseño, conservación, equipos, condiciones generales y la ganancia del contratista.   ($5,161,900-350,000-141,600-160,000-681,402-765,779.60) x 4%=$122,524.74.

[21]Esta suma equivale al arbitrio pagado de $213,758.29 más la deficiencia notificada de $29,968.

comprendida dentro del término subasta, por lo que la fecha para determinar el arbitrio es la del cierre del requerimiento de propuestas, es decir, que aplica la tasa del 4% vigente a ese momento. Además, razonó que la facultad para imponer el arbitrio está sujeta a los costos de construcción y no al valor del contrato, por lo que entendió que ciertas partidas de condiciones generales, conservación y la ganancia del contratista, entre otras, no son partidas relacionadas con la construcción del proyecto sujetas al arbitrio de construcción. Así las cosas, ordenó el reembolso de $121,201.55 pagados en exceso, según reclamado por ECA.

El Municipio acudió ante el Tribunal de Apelaciones, el cual confirmó al Tribunal de Primera Instancia mediante Sentencia emitida el 16 de septiembre de 2014.

Inconforme, el Municipio acude ante este Tribunal y se reafirmó en los argumentos esgrimidos ante los foros recurridos. Este Tribunal expidió el recurso y con el beneficio de la comparecencia de las partes está en posición de atenderlo en los méritos.

II

A.

La facultad para imponer contribuciones le corresponde primordialmente a la Rama Legislativa. Art. II, Sec. 2., Const. ELA, LPRA Tomo 1; Cía Turismo de P.R. v. Mun. de Vieques, 179 DPR 578, 583-584 (2010). No obstante, no existe impedimento para que la Asamblea Legislativa delegue expresamente su facultad para imponer contribuciones. Interior Developers v. Mun. de San Juan, 177 DPR 693, 703

(2009); HBA Contractors v. Mun. de Ceiba, 166 DPR 443, 453-454 (20015). A tenor con esa autoridad, se delegó a los municipios el poder de imponer tributos para que éstos puedan recaudar fondos y brindar mejores servicios a sus habitantes. *Véanse*, Muñiz Burgos, Inc. v. Mun. Yauco, 187 DPR 665, 675 (2013); El Día, Inc. v. Mun. de Guaynabo, 187 DPR 811, 818 (2013); Const. José Carro v. Mun. Dorado, 186 DPR 113, 121 (2012); Pfizer Pharm. v. Mun. de Vega Baja, 182 DPR 267, 286 (2011); Cía Turismo de P.R. v. Mun. de Vieques, *supra*, págs. 583-584; Café Rico, Inc. v. Mun. de Mayagüez, 155 DPR 548, 559 (2001).

Con ese objetivo, se aprobó la Ley Núm. 81-1991, según enmendada, conocida como la *Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991*, 21 LPRA sec. 4001 *et seq.* (Ley Núm. 81). Este estatuto, establece claramente que la interpretación a los poderes y facultades conferidos a los municipios por éste o cualquier otro, se interpretarán liberalmente para que se propicie el desarrollo e implantación de la política pública de garantizar a los municipios las facultades necesarias en el orden jurídico, fiscal y administrativo. De tal forma que éstos, puedan atender eficazmente las necesidades y el bienestar de sus habitantes. Art. 3 de la Ley Núm. 81, 21 LPRA sec. 4003; Río Const. Corp v. Mun. de Carolina, 153 DPR 615 (2001). Es decir, en aras de cumplir con la intención legislativa, la interpretación judicial debe avalar una delegación amplia al poder impositivo conferido al municipio. Cía Turismo de P.R. v. Mun. de Vieques, *supra*,

págs. 584-585; Café Rico, Inc. v. Mun. de Mayagüez, *supra*, pág. 553. La política pública implantada buscaba descentralizar el gobierno con el fin de desarrollar una mayor autonomía municipal. Const. José Caro v. Mun. Dorado, *supra*, pág. 122.

Dentro de los poderes delegados se encuentra la potestad de imponer y cobrar contribuciones, derechos, licencias, **arbitrios de construcción** y otros arbitrios e impuestos, tasas y tarifas razonables dentro de sus límites territoriales en la medida que sean compatibles con el Código de Rentas Internas y las leyes del Estado. Art. 2.002(d) de la Ley Núm. 81, 21 LPRA sec. 4052(d). En lo particular a las obras de construcción, el arbitrio de construcción es una contribución separada que recae sobre el derecho a llevar a cabo una actividad de construcción o una obra de construcción dentro de los límites territoriales del municipio. Íd. *Véase, además*, Art. 1.003 (cc) de la Ley Núm. 81, 21 LPRA sec. 4001 (cc); Muñiz Burgos, Inc. v. Mun. Yauco, *supra*, pág. 675.

Como el fin de la Ley Núm. 81 es ampliar la facultad impositiva de los municipios, la legislación definió de forma abarcadora lo que se contempla como actividad de construcción. Por ello, incluyó no tan sólo el acto de construir, sino que además el de reconstruir, ampliar, reparar, demoler, remover, trasladar o relocalizar cualquier edificación, obra, estructura, casa, o construcción fija y permanente. No importa si ésta es de naturaleza pública o privada, o requiera o no de un permiso de construcción.

Asimismo, destaca que la obra de construcción comprende hasta la pavimentación, repavimentación, construcción o reconstrucción de estacionamientos, puentes, calles, caminos, carreteras, aceras y encintados. Más aún, la actividad de construcción incluso abarca hasta las excavaciones para instalar tuberías o cablería de cualquier tipo que requiera la apertura de huecos o zanjas.

Lo importante es que la obra de construcción se realice en los límites territoriales del municipio. El obligado a pagar el arbitrio de construcción puede ser el dueño de la obra o las personas contratadas por éste para realizarlas. *Véase*, Art. 1.003 (dd) y (ee) de la Ley Núm. 81, 21 LPRA sec. 4001 (dd) y (ee). Igualmente, el estatuto impuso que el incumplimiento con el referido pago conlleva el que no se otorguen los permisos de construcción correspondientes. Art. 2.002 de la Ley Núm. 81, *supra.*

B.

Para fijar el tributo, la Ley Núm. 81 establece que "el arbitrio de construcción municipal **será el vigente a la fecha de cierre de la subasta** debidamente convocada **o a la fecha de la adjudicación del contrato para aquellas obras de construcción que no requieran subastas**". Art. 2.002(d) de la Ley Núm. 81, 21 LPRA sec. 4052(d).[22] (Énfasis suplido).

---

[22]Como todo proyecto de construcción, éste puede ser objeto de cambios que aumentan o disminuyen el arbitrio de construcción pagado. En esos casos, la Ley Núm. 81 provee lo que procede en esas circunstancias. De ocurrir una ampliación, el arbitrio de construcción se fijará a la fecha de la petición de orden de cambio. Por el contrario, si la orden de cambio reduce el costo final de la obra, la persona que pagó el arbitrio tiene derecho a reclamar un

Con relación al momento en el que se fija el arbitrio de construcción, hemos establecido que en los casos de subasta pública el tributo se fija desde que se adjudica la buena *pro* al licitador agraciado. En Río Const. v. Mun. de Caguas, 155 DPR 394 (2001), concluimos que la fecha de adjudicación es precisamente cuando surge una relación contractual entre las partes, la cual no puede ser resuelta o alterada unilateralmente. Íd., pág. 416. Razonamos que, en estos casos, cuando el contratista hace su oferta considera el monto de las imposiciones contributivas para determinar el precio de la obra. Además, señalamos que las partes no deben estar sujetas a la incertidumbre de cambio en los arbitrios luego que licitan conociendo cuál era el vigente al momento de formalizar su oferta. Íd., págs. 415-516. Ello pues, la subasta es un proceso en el que no tiene cabida la negociación. R & B Power v. E.L.A., 170 DPR 606, 621 (2007).

En los casos de contratación por pública subasta, la adjudicación de ésta a favor de una parte está supeditada a que contenga todos los elementos esenciales para la conclusión del contrato. Prods. Tommy Muñiz v. COPAN, 113 DPR 517, 523 (1982). Por ello, hemos establecido que el acto de adjudicar la buena *pro* al licitador crea "una relación contractual… que no puede ser resuelta unilateralmente o arbitrariamente". Cancel v. Municipio de San Juan, 101 DPR 296, 299 (1973). Ahora bien, en los casos de fondos públicos o entidades gubernamentales, la adjudicación no obliga a la

---

reembolso por la cantidad pagada en exceso. Art. 2.002(d) de la Ley Núm. 81, 21 LPRA sec. 4052 (d).

agencia hasta que se formalice el contrato escrito para la ejecución de la obra conteniendo todos los requisitos legales. Justiniano v. E.L.A., 100 DPR 334, 340 (1971). En casos de subasta, el Art. 2.002 (d) de la Ley Núm. 81, *supra*, establece expresamente que el arbitrio de construcción se fija al momento del cierre de la subasta.

No obstante, el estatuto dispone que para aquellas obras en las cuales no se celebró subasta la fecha determinante para asignar el arbitrio de construcción es la vigente a la firma del contrato. La controversia que se suscita es si ello aplica al caso ante nuestra consideración.

Para ello, la Opinión Mayoritaria correctamente expone que otro mecanismo disponible para adquirir bienes y servicios lo es el requerimiento de propuestas. Caribbean Communications v. Pol. de P.R., 176 DPR 978, 996 (2009); R & B Power v. E.L.A., *supra*. A diferencia de la subasta, la característica predominante del requerimiento de propuestas es que éste admite la negociación, por lo que es un mecanismo de compra negociada. R & B Power v. E.L.A., *supra*, pág. 621. Este proceso normalmente es uno de naturaleza competitiva para adquirir servicios especializados o altamente técnicos y complejos, o cuando existen escasos competidores cualificados. Íd., págs. 621-622. Por ello, el requerimiento de propuestas permite entablar negociaciones con los licitadores durante la evaluación de las propuestas recibidas, proveyéndoles la oportunidad de revisar y modificar sus ofertas antes de su adjudicación. De hecho,

hemos expresado que "el factor central para determinar si hubo o no una negociación en un procedimiento de subasta mediante un [requerimiento de propuestas] es si se le concedió al licitador la oportunidad de revisar y modificar su propuesta". Caribbean Communications v. Pol. de P.R., *supra*, pág. 997.

En el caso de las alianzas público privadas, el *Reglamento para la licitación, evaluación, selección, negociación y adjudicación de contratos de Alianzas Público Privadas bajo la Ley Núm. 29 del 8 de junio de 2009*, Reglamento Número 7853 de 17 de mayo de 2010 (Reglamento), dispone en su inciso 4.10 que la propuesta presentada puede ser modificada sólo en una ocasión antes de la fecha de vencimiento. Sin embargo, ello no impide que la evaluación de la propuesta presentada esté sujeta a negociación o modificaciones posteriores durante la etapa de su evaluación. Como veremos, la Sección 5 del Reglamento es la que establece el proceso de evaluación y selección de propuestas. A estos efectos, establece un proceso de tres fases, según apliquen.

En lo pertinente, la primera fase consiste en una revisión de control de calidad para determinar si las propuestas aprobaron los requisitos básicos delineados. *Véase*, Sección 5.1(a) del Reglamento. Una vez cumplido con ese control de calidad, la segunda fase consiste en la revisión y evaluación de las propuestas. En esta etapa, se puede solicitar información adicional que asista a este objetivo y se seleccionará **una o ninguna de las propuestas**

**cuando estamos ante un proceso de no-negociación.** Sin embargo, el Reglamento contempla el que se seleccionen varias propuestas en aquellas instancias donde existen negociaciones competitivas. *Véase*, Sección 5.1 (b)(i) del Reglamento.

Ahora bien, en aquellos procesos competitivos, se pueden seguir negociaciones entre las partes o un proceso regular de no licitación. Así las cosas, la tercera fase dependerá de si se trata de un **proceso competitivo con negociaciones simultáneas** (Fase Tres-A), un **proceso con negociación** con los proponentes clasificados (Fase Tres-B) o uno **regular de licitación no negociado** (Fase Tres-C).

Particularmente, la Fase Tres-A consiste de un proceso competitivo en el que se consideran las propuestas conforme a unos criterios de evaluación para clasificarlas. A base de esa clasificación, se realizan discusiones y negociaciones con todos los proponentes, o se negocia con el proponente mejor calificado y de no ser fructífero, se continúan negociaciones en el orden correspondiente. *Véase*, Sección 5.1 (c) del Reglamento.

Conforme a lo anterior, se puede invitar a reuniones privadas para discutir y contestar preguntas sobre la propuesta, mejorar aspectos técnicos, y otros tipos de discusiones brindando a todos los proponentes la oportunidad de discutir y repasar sus propuestas. Asimismo, se les permite proveer su mejor y última oferta en respuesta a las discusiones y negociaciones celebradas. Mientras que la Fase Tres-B contempla la negociación con el proponente con la

clasificación más alta, y de terminarse las negociaciones con éste se pueden comenzar negociaciones con el próximo proponente dentro de la clasificación. *Véase*, Sección 5.1 (d) del Reglamento. Tanto en la Fase Tres-A como la Fase Tres-B estamos ante procesos de negociaciones. *Véanse*, Sección 5.1 (c) y (d) del Reglamento. Sin embargo, si la evaluación prosigue el procedimiento establecido en la Fase Tres-C (no-negociado) estamos ante un proceso competitivo regular de licitación donde se elige el proponente que sometió la propuesta más alta basado en los criterios solicitados, **sin discusión o negociación alguna con ningún proponente**, como si fuera una subasta. *Véase*, Sección 5.1 (e) del Reglamento.

Lo expuesto, refleja que en requerimientos de propuestas como el de autos, la evaluación puede incluir negociaciones posteriores con los proponentes que permiten la modificación de la oferta original en una etapa posterior a la fecha de cierre del requerimiento de propuestas. Por tanto, de seguirse este tipo de evaluación que permite la negociación posterior y presentación de una propuesta final, no podemos equiparar el requerimiento de propuesta a una subasta.

C.

Por otro lado, las partidas que se incluyen como parte del cómputo del arbitrio de construcción han sido objeto de cuestionamiento ante este Tribunal. En su origen, se impugnaba el que el arbitrio impuesto sobre la obra de construcción constituía una doble tributación al incluir el

costo total de la obra, pues por ésta también se pagaban patentes municipales. Sin embargo, el 6 de septiembre de 1996, la Ley Núm. 81 fue enmendada y se aprobó la *Ley de Arbitrios Municipales*, Ley Núm. 199-1996 (21 LPRA secs. 4001(bb) y (cc), 4052 (d) y 4057) que aclaró las partidas que no forman parte del cómputo para la determinación del arbitrio de construcción.[23] V*éase*, <u>Levy, Hijo v. Mun. de Manatí</u>, 151 DPR 292 (2000).

Al aprobar la Ley Núm. 199-1996, resulta relevante indicar que al momento de presentarse el proyecto surgía la distinción del arbitrio de construcción frente a las patentes municipales. Específicamente, se explicó que la patente municipal grava el volumen bruto de negocios mientras que el arbitrio de construcción no. Así, el proyecto original para aprobar la Ley Núm. 199-1996 disponía que:

> [p]ara los propósitos de la determinación del arbitrio de construcción, el costo total de la obra será el costo de adquisición de terrenos, edificaciones ya construidas y enclavadas en el lugar de la obra, costos de estudios, diseños, planos, permisos, consultoría, servicios legales **y contabilidad, financiamiento, mercadeo, publicidad, ventas y gastos de oficina**. Véase, P. de la C. 1938 presentado el 18 de mayo de 1995, 5ta. Sesión Ordinaria, 12ma. Asamblea Legislativa, pág. 5. (Énfasis suplido).

Cónsono con ello, la exposición de motivos del proyecto que se convirtió en la Ley Núm. 199-1996 advertía que ello significaba el "ingreso neto resultante de la obra de construcción". <u>Íd.</u>, pág. 4. Tal lenguaje provocó un

---

[23]La Ley Núm. 199-1996 se originó como el P. de la C. 1938.

sinnúmero de comentarios dirigidos a aclarar la base sobre la cual se impone la tasa de arbitrios de construcción. En particular, se señaló que la nueva fórmula provocaría nuevas controversias al proveer para que se descontaran gastos administrativos a quien realice la obra o mejora. Se advirtió que los desarrolladores intentarían descontar una mayor cantidad de gastos sin que los municipios pudieran auditar éstos. Igualmente, se destacó que el texto propuesto sugería que al costo total de construcción, se eliminarían los costos incurridos previos al comienzo de la actividad de la obra. Por tanto, se solicitó eliminar la referencia a que el arbitrio de construcción corresponde al ingreso neto resultante de la obra en construcción.[24] *Véanse*, Ponencia del Gobierno Municipal de Ponce de 10 de julio de 1995 sobre el P. de la C. 1938, págs. 3-4; Ponencia del Gobierno Municipal de Loíza de 8 de julio de 1995 sobre el P. de la C. 1938, págs. 2-4; Ponencia del Gobierno Municipal de Ponce de 14 de junio de 1995 sobre el P. de la C. 1938, págs. 1-3.

Atendiendo las preocupaciones esgrimidas, el proyecto que culminó en la Ley Núm. 199-1996 sufrió unas enmiendas. En lo pertinente, se eliminó la referencia a los gastos de **contabilidad, financiamiento, mercadeo, publicidad, ventas y gastos de oficina** como partidas no sujetas al tributo de construcción para solamente excluir aquellas partidas en las

---

[24] Ello pues, se sostenía que la práctica no incluía los costos de adquisición de terrenos, edificaciones ya construidas y enclavadas, costos de estudios, diseños, planes y permisos como parte del costo para determinar el arbitrio de construcción correspondiente.

que se incurre previo al comienzo de la obra de construcción. *Véanse*, Informe del Senado sobre el P. de la C. 1938 de 10 de junio de 1996, 7ma. Sesión Ordinaria, 12ma Asamblea Legislativa, pág. 2; Informe de la Cámara de Representantes en torno al P. de la C. 1938 de 8 de mayo de 1996, 7ma. Sesión Ordinario, 12ma. Asamblea Legislativa, págs. 2, 23. Asimismo, se excluyó de la exposición de motivos de la Ley Núm. 199-1996, cualquier referencia a que el arbitrio de construcción recaía sobre el ingreso neto resultante de la obra de construcción. Con esas enmiendas fue aprobada la Ley Núm. 199-1996.

El efecto de la enmienda aclaró que la cuantía del arbitrio de construcción se determina a base del "**costo en que se incurra para realizar el proyecto luego de deducirle el costo de adquisición de terrenos, edificaciones ya construidas y enclavadas en el lugar de la obra, costos de estudios, diseños, planos, permisos, consultoría y servicios legales**". Art. 2.002 (d) de la Ley Núm. 81, 21 LPRA sec. 4052(d). (Énfasis suplido). Estas partidas excluidas no constituyen una actividad directa de construcción y ocurren **antes** de comenzar la obra o construcción con el fin de evitar una carga onerosa para el diseño de ésta antes de ser realizada. HBA Contractors, v. Mun. de Ceiba, *supra*, pág. 472; *véase*, además, Informe de la Comisión de Asuntos Municipales y de la Comisión de Hacienda de la Cámara de Representantes con respecto al P. de la C. 1938 de 8 de mayo de 1996, págs. 22-23. Igualmente, eliminó todo debate de que el arbitrio de construcción constituya una doble tributación

impuesta por una misma actividad y se despejó la incertidumbre en torno a si éste recaía sobre el ingreso neto de la obra de construcción. Claramente, esto respondió a la política pública expuesta de conceder mayores facultades impositivas a los municipios.

III

La controversia ante nuestra consideración surge por una discrepancia con relación a cuál es la tasa del arbitrio de construcción que debe imponerse en el desarrollo del proyecto CROEM y sobre cuáles partidas deben incluirse en el cómputo. Por una parte, el Municipio reclama que la tasa contributiva debe ser la del 5%, conforme dispone la Ordenanza Núm. 11, Serie 2011-2012, y que no proceden las deducciones solicitadas por ECA en cuanto a las partidas de conservación, equipos, ganancia del contratista y otras. Por el contrario, ECA sostiene que el impuesto debe ser de 4%, a tenor con la Ordenanza Núm. 119, Serie 2001-2002, vigente al momento del cierre del requerimiento de propuestas y que no procede la imposición sobre ciertas partidas que entiende no están relacionadas directamente con la construcción de la obra.

En primer lugar, al examinar el aviso de adjudicación a favor de ECA, se desprende que el proceso de evaluación de las ofertas presentadas fue uno de negociación con proponentes múltiples a tenor con la Fase Tres del Reglamento, descartándose un proceso de no-negociación contemplado también en el Reglamento. Los hechos demuestran diáfanamente que todas las propuestas fueron revisadas a tal

grado que prácticamente todas las partidas sufrieron modificaciones.[25]

Del aviso de adjudicación surge que la evaluación consideró paralelamente a tres proponentes que reflejaron la mejor calidad por el valor propuesto y se les convocó para **"negociaciones ulteriores"**.[26] Así las cosas, se procedió simultáneamente a reunirse con éstos de forma individual para que **revisaran** sus ofertas. Luego de evaluadas y aclaradas las propuestas **revisadas**, se determinó que ECA era el consorcio que mejor valor por la calidad de trabajo propuso mediante la **oferta final y firme negociada del 9 de marzo de 2012**.[27]

Los hechos ante nuestra consideración claramente reflejan que la evaluación de las propuestas no estuvo exenta de discusión y negociaciones. En este sentido, se calificó a los proponentes, se negoció a la vez con éstos, y se les ordenó revisar las propuestas. Cuando todos presentaron sus propuestas revisadas y finales éstas fueron evaluadas para determinar a quién se debía adjudicar la obra. No cabe duda de que la evaluación no consistió en la adjudicación al licitador con la clasificación más alta de los criterios a cumplir, sin discusión o negociación alguna entre las partes.

---

[25]La única partida que no fue alterada fue la referente al gasto de conservación.

[26]*Véase*, Aviso de Adjudicación, Apéndice del recurso de *certiorari,* pág. 83.

[27]Íd., págs. 83 y 87.

Ante tal realidad, no puedo avalar una interpretación a los efectos de que procede equiparar, bajo estas circunstancias, el requerimiento de propuestas del proyecto de CROEM a uno de subasta. Ello pues, lo acontecido demuestra, sin ambages, que hubo negociaciones al grado de que se concedió la oportunidad a los proponentes de revisar y modificar sus propuestas. Siendo ello así, la Ley Núm. 81 dispone expresamente que el arbitrio será el vigente a la fecha de adjudicación del contrato. Art. 2.002 (d) de la Ley Núm. 81, *supra*. Es decir, el arbitrio vigente al 11 de abril de 2012.

Por tanto, habiéndose aprobado la Ordenanza Núm. 11, Serie 2011-2012, desde enero de 2012 y estando vigente desde el 11 de febrero de 2012, procedía el arbitrio de 5% contemplado en ésta. A la fecha de la presentación de las propuestas finales, los proponentes conocían de la vigencia de la Ordenanza Núm. 11, Serie 2011-2012, por lo que éstos no estaban impedidos de considerar el monto de esa imposición contributiva al momento de revisar las propuestas finales para la realización del proyecto. Es decir, ECA sabía que el impuesto vigente era de 5% al momento de presentar su oferta final el 9 de marzo de 2012. Por ende, no estaba impedida ni existía incertidumbre en cuanto al arbitrio vigente.

Con relación a las partidas a ser incluidas en el cómputo del arbitrio de construcción, es imperativo recordar que la Ley Núm. 81 faculta a los municipios a imponer el tributo sobre la construcción de obras en sus límites

territoriales. Tal poder responde a la política pública de viabilizar la autonomía municipal con el fin de que se recauden fondos para brindar mejores servicios a la ciudadanía. Al enmendar la Ley Núm. 81 hubo una amplia discusión sobre las consecuencias de eximir del arbitrio de construcción partidas relacionadas con la contabilidad, financiamiento, mercadeo, publicidad, ventas y gastos de oficina, ya que se entendía que la fiscalización de estos gastos imposibilitaba el fin público del tributo sobre la obra de construcción. Atendiendo esa preocupación, el lenguaje propuesto en el proyecto de ley se enmendó para eliminar las referencias a estas partidas y excluir sólo aquellas en la etapa anterior al proyecto. De esta manera, se buscó no encarecer el costo de construcción a la vez que se promulgó el recaudo de fondos a las arcas municipales.

Sobre este particular, ECA reclama que no procedía imponer arbitrios de construcción con relación al diseño ($350,000), costo de conservación de la obra ($141,600), equipos ($160,000), condiciones generales ($681,402)[28] y la ganancia del contratista ($765,779.60). Por su parte, el Municipio entendió que sólo procedía excluir la partida

_____

[28]Estos responde a restauración de oficina de inspección ($10,000), Permiso de demolición ($5,000), Permiso Consolidado (5,000), Permiso de excavación ($1,000), Plan de Mantenimiento para la Construcción ($18,000), Permiso Mitigación Plomo ($8,000), Oficina de Inspección y construcción en campo ($72,000), Permiso Mitigación Asbesto ($8,000), Administración ($96,000), impuestos ($238,375.91), Plan de Seguridad y Control ($36,000), Construction Project Management ($6,000), Storm Water Pollution Plan ($6,000), Seguros ($171,026.10) y Rótulo Proyecto ($1,000). *Véase*, Apéndice del recurso de *certiorari*, pág. 166.

relacionada con el diseño. Entiendo que procede descontar del cómputo partidas adicionales a las descontadas por el Municipio.

Ciertamente, el arbitrio de construcción no procede sobre la totalidad del costo de la obra ascendente a $5,161,900. No obstante, considero que al costo de construcción procede descontarle las partidas que la Ley Núm. 81 exime del pago de arbitrio de construcción de acuerdo con el Art. 2.002 (d) de la Ley Núm. 81, *supra*. Éstas son el costo de adquisición de terrenos, edificaciones ya construidas y enclavadas en el lugar, costos de estudios, diseño, planos, permisos, consultoría y servicios legales.

Al examinar las partidas del proyecto en cuestión, opino que debe excluirse del cómputo del arbitrio de construcción las relacionadas al diseño ($350,000), condiciones generales relacionadas con los permisos y contribuciones necesarias para proseguir con el proyecto ($271,735.91)[29] y la de conservación de la obra ($141,600), por ser ésta una actividad no relacionada con su construcción. Empero, procede el pago de arbitrios con relación a los equipos ($160,000), condiciones generales ($410,026.10)[30] y la ganancia del contratista ($765,779.60).

---

[29]Esto equivale a las partidas desglosadas en las condiciones generales de Permiso de demolición ($5,000), Permiso Consolidado ($5,000), Permiso de excavación ($1,000), Permiso Mitigación Plomo ($8,000), Permiso Mitigación Asbesto ($8,000), impuestos ($238,375.91), y el *Storm Water Pollution Plan* ($6,000). Íd.

[30]Esta suma proviene del gasto por restauración de oficina de inspección ($10,000), Plan de Mantenimiento para la Construcción ($18,000), Oficina de Inspección y

Una interpretación contraria abriría las puertas a evadir el mandato legislativo.

Por consiguiente, el arbitrio de construcción que debió pagar ECA por el proyecto de CROEM asciende a $219,928.20.[31] ECA pagó la totalidad de $243,726.29[32] por arbitrios de construcción, por lo que el Municipio debería reembolsar $23,798.09 que corresponde a lo pagado en exceso.

IV

Por las razones expuestas, disiento del dictamen emitido por la Mayoría de este Tribunal.

Luis F. Estrella Martínez
Juez Asociado

---

construcción en campo ($72,000), Administración ($96,000), Plan de Seguridad y Control ($36,000), Construction Project Management ($6,000), Seguros ($171,026.10) y Rótulo Proyecto ($1,000). Íd.

[31]Este es el producto del costo de la obra menos las partidas aquí determinadas por el 5% del tributo impuesto conforme a la Ordenanza Núm. 11, Serie 2011-2012, vigente al momento de la firma del contrato. ($5,161,900-350,000-271,735.91-141,600) X 5%= $219,928.20.

[32]ECA pagó originalmente $213,758 por concepto de arbitrios más la deficiencia notificada por el Municipio de $29,968.